Duggan *v.* 807 Liberty Ave., Inc. et al.,
Appellants.

Argued September 30, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Marjorie Hanson Matson,* with her *H. David Rothman,* for appellants.

*D. Michael Fisher,* Assistant District Attorney, with him *Robert W. Duggan,* District Attorney, for appellee.

OPINION BY MR. JUSTICE EAGEN, March 20, 1972:

By this appeal, we are asked to remove the onus of injunction from appellants who were showing certain motion pictures asserted to be obscene by the District Attorney of Allegheny County. We are impelled to reverse the decree of the lower court because the procedure utilized by the authorities is constitutionally deficient and the fact that the movies may be obscene, and therefore capable of proscription, cannot rescue it.[1]

The present dispute arose in the following manner:

On August 9, 1971, the District Attorney filed a complaint in equity in the Court of Common Pleas of Allegheny County, Civil Division, to enjoin the exhibition of certain allegedly obscene movies which were then being shown at the Liberty Adult Movie Theatre, Pittsburgh. The court listed the case for hearing on August 13th and directed appellants to produce copies of the films on view at the time of the filing of the complaint and any other similar films being exhibited on the date set for hearing.

Appellants filed preliminary objections to the complaint asserting a lack of jurisdiction to enjoin the activity, denying that the films were obscene in the con-

---

[1] Our disposition of this case is such that we need not and do not pass upon the obscenity vel non of the instant films.

stitutional sense and challenging the authority of the District Attorney to proceed without posting a bond.

These objections were overruled at the aforementioned hearing. Appellants were then required to produce "Rubber Anniversary" and "Money Honey", films which had been mentioned in the complaint. The first of these films was viewed by the court and it was stipulated that the latter movie was of a similar nature.

At a continued hearing, held on August 16th, testimony was offered by the District Attorney that the films then on view at the theatre[2] were substantially similar to that which the court had viewed, i.e., in each case the films depicted actual acts of sexual intercourse and other forms of sexual relations.

Besides the movies themselves, the only other evidence produced by the movant was testimony by law-student summer employees of the District Attorney's office to the effect that the instant films were the same kind of movies that they, as students, had seen at stag parties in the Pittsburgh area. Appellants declined to offer testimony and rested.

The court then preliminarily enjoined appellants from showing the four films as to which evidence had been offered.[3] The District Attorney asked that a date

---

[2] "Jobs, Jobs, Jobs" and "How to Make a Sex Movie".

[3] In an opinion filed August 26, 1971, in support of his order, Judge McKENNA categorized the movie "Rubber Anniversary" as hardcore pornography and as a film which "portrayed one act of sexual intercourse after another, for no apparent reason. There was no plot. The acts included all forms of intercourse, such as fellatio and cunnilingua. It also displayed complete nudity in color and several scenes of group sexual activity." The depicted sexual activity in the court's estimation appealed only to the prurient interests of the viewers. The court deemed evidence as to community standards unnecessary saying, ". . . [this] film . . . must offend, if there are any moral standards at all." Likewise the film was found to be utterly devoid of any redeeming social value. Since there was uncontradicted testimony that the other three films were similar

be set immediately to determine whether the injunction should be made permanent. Indicating they intended to file an appeal, appellants requested that the date be set for some time in October, 1971, which was done.[4] They also requested that the appeal act as a supersedeas, but the trial judge declined to do so. An appeal was then timely filed in this Court.

Appellants' primary contention is, of course, that the procedure by which the preliminary injunction was obtained was, in light of the First and Fourteenth Amendments, cogenitally defective since there was no guarantee of speedy resolution on the merits of the question of obscenity, and that therefore the lower court lacked power to bar these films.

Subsidiarily they argue that it was error to grant an injunction without requiring the District Attorney to file a bond, and also that there was a failure of proof on whether these movies were obscene in the constitutional sense.

There is also an additional inquiry, raised by the District Attorney's motion to quash this appeal, concerning this Court's jurisdiction to hear the instant appeal. It is to this latter question that we first direct our attention.

The District Attorney premises his conclusion that the present appeal is not properly before this Court on his reading of the Appellate Court Jurisdiction Act, Act of July 31, 1970, P. L. 673, No. 223, 17 P.S. §211.-402, which provides the Commonwealth Court with exclusive jurisdiction of appeals from final orders of the Courts of Common Pleas in all civil actions to which the Commonwealth or any officer thereof, acting in his

---

to the film reviewed by the court, they too were embraced by the injunction.

[4] The hearing date on the permanent injunction was set for October 13, 1971.

official capacity, is a party.[5] In this connection, appellee also cites what he perceives to be the holding of this Court in the cases of *Commonwealth ex rel. Specter v. Freed,* 424 Pa. 508, 228 A. 2d 382 (1967), and *Commonwealth ex rel. Specter v. Martin,* 426 Pa. 102, 232 A. 2d 729 (1967), namely, that the district attorney is an officer of the Commonwealth. Thus, it is asserted, the net effect of the Appellate Court Jurisdiction Act of 1970, was to narrow the equity jurisdiction of this Court and that it was the intent of the legislature to confer upon the Commonwealth Court exclusive jurisdiction of appeals involving all officers of the Commonwealth, not merely officers of administrative agencies or departments.

We disagree. Neither of the aforementioned cases hold that a district attorney is an officer of the Commonwealth and therefore are improperly cited as precedent for that proposition.[6]

The holding in the former case was that the Home Rule Charter of the City of Philadelphia could not clothe the district attorney with subpoena powers, while in the latter decision a plurality of the Court said that certain provisions (§10-109) of the Philadelphia Home Rule Charter did not apply to the district attorney such that he had to resign from his office by reason of his candidacy for election as mayor.

---

[5] *Assuming arguendo,* the truth of this assertion, we would transfer this case to the proper court as mandated by 17 P.S. §211.-503(b) instead of quashing the appeal.

[6] Such a bald statement would encounter innumerable difficulties as aptly noted by former Mr. Chief Justice BELL in his dissent in *Commonwealth ex rel. Specter v. Freed,* supra. The Constitution of Pennsylvaina of 1874, Article XIV, §1, listed district attorneys in its enumeration of county officers, as does the present Constitution of 1968. See Article IX, §4. Significant also is the fact that the powers and functions of the office are found in Title 16, Counties, of Purdon's Statutes.

What both decisions do indicate is that the office of district attorney is actually something of a hybrid; denominated a county office holder by the Constitution, the district attorney performs his duties on behalf of the Commonwealth.

Hence we do not believe that the district attorney comes squarely within the description of "officer of the Commonwealth" as contemplated by §211.402 of the Appellate Court Jurisdiction Act. More properly, the group envisioned there were the officers of state agencies and departments, thus concentrating administrative law appeals in one tribunal.

Jurisdiction over the present appeal correctly resides in this Court.[7]

Our scope of review in this case is well settled. In *Community Sports, Inc. v. Denver Ringsby Rockets, Inc.*, 429 Pa. 565, 569, 240 A. 2d 832 (1968), we said: " '[O]n an appeal from a decree which refuses, grants or continues a preliminary injunction, we will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable'."

As recently as last term in *United States v. Reidel*, 402 U.S. 351, 91 S. Ct. 1410 (1971), the United States

---

[7] Since the bond requirement issue also presents a question of status, it is here appropriate and sufficient merely to note that the Pennsylvania Rules of Civil Procedure provide that a preliminary injunction shall be granted only if the plaintiff files a bond in an amount fixed by the court "except when the plaintiff is the Commonwealth of Pennsylvania, a political subdivision . . . or officer of the Commonwealth or of a political subdivision." Pa. R. C. P. 1531(b). The present case fits within this clear exception and hence the lower court's ruling on this point was correct. See also Pa. R. C. P. 1549(4).

Supreme Court reaffirmed its holding in the *Roth* case that obscenity is not within the area of constitutionally protected speech or press[8] and that state governments retain broad power to regulate obscenity. See also, *Rage Books, Inc. v. Leary,* 301 F. Supp. 546 (S.D. N.Y. 1969). However, "[t]he existence of the state's power to prevent the distribution of obscene matter does not mean that there can be no constitutional barrier to any form of practical exercise of that power. . . ." *Smith v. California,* 361 U.S. 147, 155, 80 S. Ct. 215, 220 (1959). Under the Fourteenth Amendment, a state is ". . . not free to adopt whatever procedures it pleases for dealing with obscenity . . . without regard to the possible consequences for constitutionally protected speech."[9] *Marcus v. Search Warrant,* 367 U.S. 717, 731, 81 S. Ct. 1708, 1716 (1961). Where a state seeks to exercise its power to prevent commercial dissemination of allegedly obscene material, it must establish precise objective standards by which a work may be judged, as well as procedural safeguards adequate to insure that constitutionally protected expression, which is often

---

[8] *Roth v. United States,* 354 U.S. 476, 77 S. Ct. 1304 (1957). Obscenity finds itself without the protection of the First Amendment because by definition, it lacks communicative value. See *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S. Ct. 766 (1942).

[9] In *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S. Ct. 777 (1952), the Supreme Court held that the protections of the First Amendment extended to motion pictures. The Court stressed the significance of films as a medium for the communication of ideas and concluded that expression by means of motion pictures is included within the free speech and free press guarantees of the First Amendment. The Court added, however, that this protection like that for other means of expression, is not absolute and stated that the peculiar nature of films might require that special rules be developed in this area. 343 U.S. at 502, 503. The specific time provisions for a final judicial decision on obscenity vel non, so vital in the instant case (see discussion infra) is one such "special rule" developed by the Court subsequent to the *Burstyn* case.

separated from obscenity by a dim and uncertain line, will not be abridged. See *Freedman v. Maryland,* 380 U.S. 51, 85 S. Ct. 734 (1965).[10]

The vigilance of the courts is commanded because of the danger of undue prior restraint and the possible chilling effect that regulation can inflict on the exercise of First Amendment freedoms. Such inhibitions as these can never be tolerated because as Mr. Justice CARDOZO has said: "freedom of thought and speech . . . is the matrix, the indispensable condition, of nearly every other form of freedom. With rare aberrations a pervasive recognition of that truth can be traced in our history, political and legal." *Palko v. Connecticut,* 302 U. S. 319, 326, 327, 58 S. Ct. 149, 152, 153 (1937).

The District Attorney asserts that such dangers were presently averted in two ways. First, the injunction here was not issued ex parte but came instead after an adversary hearing was conducted on the question of obscenity. Second, a request was made for an immediate hearing to determine whether the injunction should be made permanent under Pa. R. C. P. 1531(e).

Appellants relying, inter alia, on language found in *Commonwealth v. Guild Theatre, Inc.,* 432 Pa. 378, 248 A. 2d 45 (1968), argue that the civil injunctive procedure is constitutionally infirm because of the absence of a provision establishing time limitations for a prompt, final judicial decision.

Instructed by the decision of the federal tribunal in *Freedman v. Maryland,* 380 U.S. 51, 85 S. Ct. 734 (1965), we have determined that the instant procedure is flawed by the aforementioned deficiency such that it

---

[10] "Our insistence that regulations of obscenity scrupulously embody the most rigorous procedural safeguards . . . is therefore but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66, 83 S. Ct. 631, 637 (1963).

does not show "the necessary sensitivity to freedom of expression." 380 U.S. at 58.

In *Freedman*, supra, a Maryland film censorship statute required an exhibitor to submit the motion picture to an administrative board prior to its showing. If the board disapproved the film, the burden of instituting judicial review lay with the exhibitor. The statute placed no time limits on either the administrative or the judicial determinations.

The Court held the statute an impermissible prior restraint on expression and went on to develop a comprehensive system of procedural safeguards which included the requirement of a prompt and final judicial decision on the question of obscenity.[11] See also, *Teitel Film Corp. v. Cusack*, 390 U.S. 139, 88 S. Ct. 754 (1968).

By the same criterion, the interim restraint provided hereby the injunctive procedure also fails to pass constitutional muster. The Pennsylvania Rules of Civil Procedure simply do not designate when the final hearing must be held subsequent to the granting of a preliminary injunction.[12] The general practice is to calendar equity actions on an accelerated trial list. Addition-

---

[11] The Court cited the New York injunctive procedure sustained in *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 77 S. Ct. 1325 (1957), as a possible model which embodied the kind of procedural safeguards necessary to render the statute constitutional. It also recognized that a statute which failed to specify time limits could be saved by authoritative judicial construction [and in point of fact, took this step itself in *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 91 S. Ct. 1400 (1971).

We decline to add any such authoritative gloss to the Rules of Civil Procedure. The patent impropriety of such a step here obviates the need of discussion.

[12] The only explicit time limitation contained in Rule 1531 is the five-day provision with regard to ex parte injunctions, the use of which in obscenity litigation was condemned in *Commonwealth v. Guild Theatre, Inc.*, 432 Pa. 378, 248 A. 2d 45 (1968).

ally Pa. R. C. P. 1517 provides that the adjudication may be made orally in open court at the end of trial or it may be made thereafter in writing.

Seeking to circumvent the impact of the *Freedman* case, the District Attorney points out that his request for an immediate hearing on the permanent injunction served to guarantee "a prompt, final judicial decision". Moreover, he argues that the adversary hearing on the preliminary injunction was full and complete, and hence the hearing on the permanent injunction would be little more than a formality.

However, the fact that there was an adversary hearing at the preliminary injunctive stage does not vitiate the need for and requirement of a specific guarantee of prompt and final adjudication. Support for such a conclusion can be found in *Commonwealth v. Guild Theatre, Inc.*, supra. There the present district attorney had filed a complaint in equity alleging that the film, "Therese and Isabelle", was obscene and had obtained an ex parte injunction prohibiting its exhibition. Mr. Justice O'BRIEN'S opinion roundly condemned this procedure, saying that there should have been an adversary proceeding prior to restraint. The opinion went on to say: "However, even if a proper [i.e., adversary] hearing had been held, the instant proceeding was fatally defective in another respect. . . . The fact that appellants may have been offered a full dress *hearing* within four days of the original restraint does not suffice. Quite clearly, there is no provision for a prompt *decision*. It is vital that the continuance of First Amendment freedoms not be dependent upon the efficiency of a particular judge *but upon procedural safeguards clearly embodied in a statute.*" 432 Pa. at 382 (additional emphasis ours).[13]

---

[13] See also *Grove Press v. City of Philadelphia*, 418 F. 2d 82, 91 (3d Cir. 1969).

Prior decisions of this Court also serve to confute the assertion that the hearings on final injunctive relief would simply be a rubber stamp or echo of the earlier proceedings. The purpose of a preliminary injunction is to preserve the status quo as it presently exists or existed before the acts complained of and thus temporarily prevent irreparable injury or gross injustice. See *Slott v. Plastic Fabricators, Inc.*, 402 Pa. 433, 167 A. 2d 306 (1961). Cf. *Perloff Bros. v. Cardonick*, 406 Pa. 137, 176 A. 2d 413 (1962).

Wisdom can be gleaned from the observation that ". . . courts have lately come to realize that procedural guarantees play an equally large role in protecting freedom of speech; indeed they 'assume an importance fully as great as the validity of the substantive rule of law to be applied'. Speiser v. Randall, 357 U.S. 513, 520 (1958)." Monaghan, First Amendment "Due Process", 83 Harv. L. Rev. 518 (1970). Hence the duty of our Court under this posture of facts is clear. The Constitution requires amity of the nicest sort between the actual operation of state efforts to suppress the obscene and that area of expression preserved forever inviolate by the First Amendment. Believing that the procedure applied in this case lacked the safeguards demanded by the First and Fourteenth Amendments to assure nonobscene material the constitutional protection to which it is entitled, we must reverse the decree of the court below.

It is so ordered. Each side to pay own costs.

Former Mr. Chief Justice BELL and former Mr. Justice BARBIERI took no part in the consideration or decision of this case.

———

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I concur in the majority's reversal of the preliminary injunction entered below. Prior to our decision

today there existed in this Commonwealth no statute, controlling court decision,[1] or Rule of Civil Procedure which guaranteed, in cases where expression was challenged as obscene, that "[a]ny restraint imposed in advance of a final judicial determination on the merits [would] be limited to the preservation of the status quo for the shortest fixed period compatible with sound judicial resolution." *Freedman v. Maryland,* 380 U.S. 51, 59, 85 S. Ct. 734, 739 (1965). Thus, preliminary injunctions could be issued in this Commonwealth against allegedly obscene movies or literature without the constitutionally requisite safeguards "to minimize the deterrent effect [upon the exercise of First Amendment rights] of an interim and possibly erroneous" preliminary restraint. Id. at 59, 85 S. Ct. at 739.[2] Accordingly, the injunction here must be reversed.

However, I cannot agree with the majority's failure to establish here a decisional rule which would eliminate once and for all the chilling effect that is occasioned by the present lack of constitutionally adequate safeguards for the issuance of preliminary injunctions against expression that is arguably protected by the First Amendment. The majority, by emphasizing certain language which appeared in Mr. Justice O'BRIEN's opinion in *Commonwealth v. Guild Theatre, Inc.,* 432 Pa. 378, 248 A. 2d 45 (1968), appears to believe that the requisite procedural safeguards must be *"clearly embodied in a statute"*. I find no support in *Freedman*

---

[1] Mr. Justice O'BRIEN's opinion in *Commonwealth v. Guild Theatre, Inc.,* 432 Pa. 378, 248 A. 2d 45 (1968), cannot be viewed as firmly guaranteeing in cases such as the one before us the right of the party restrained to a prompt final judicial decision. Unfortunately, Mr. Justice O'BRIEN's opinion was joined by only myself and one other of the six members of this Court who participated in that decision.

[2] See *Grove Press, Inc. v. City of Philadelphia,* 418 F. 2d 82, 89 (3rd Cir. 1969).

*v. Maryland,* 380 U.S. 51, 85 S. Ct. 734 (1965) ; *Grove Press, Inc. v. City of Philadelphia,* 418 F. 2d 82 (3rd Cir. 1969), or in logic for such a belief. On the contrary, Article V, Section 10c of our 1968 Constitution vests this Court with specific responsibility in the area of practice and procedure for courts of this Commonwealth.

I would here establish a decisional rule that henceforth in this Commonwealth, once a preliminary injunction is issued against expression that is arguably protected by the First Amendment the party restrained shall have the right to a hearing on whether the preliminary injunction shall be dissolved or made final within five days of the issuance of the preliminary injunction, and the court must render its final adjudication within five days of this hearing.

We here have the opportunity to assure that constitutionally adequate procedural safeguards will accompany the issuance of preliminary injunctions against expression that may be protected by the First Amendment. I see no reason why we should not here proceed in accordance with Article V, Section 10c to rectify this situation.

It must be noted that the majority's failure to adopt the nonchilling procedures such as here urged (and constitutionally mandated by *Freedman* and *Grove Press*) means that the Commonwealth may not successfully seek and the Courts may not constitutionally issue preliminary injunctions in this class of cases.