587 A.2d 772

**WORLDWIDE AUDITING SERVICES, INC., Appellee,**

v.

**F. Brian RICHTER, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 5, 1990.

Filed March 13, 1991.

Robert J. Kerns, Lansdale, for appellant.

Edward Rubin, Lansdale, for appellee.

Before CAVANAUGH, OLSZEWSKI and FORD ELLIOTT, JJ.

OLSZEWSKI, Judge:

F. Brian Richter appeals from an order of the Court of Common Pleas of Montgomery County granting the petition of Worldwide Auditing Services, Inc. (Worldwide) seeking an injunction enforcing a covenant not to compete (hereinafter the Covenant). The order modifies the Covenant by confining it geographically to the State of Maryland (except the Eastern shore) and former Worldwide clients with whom Richter had contact while in Worldwide's employ. The order also awarded Worldwide damages for Richter's breach of the Covenant.[1]

Richter's appeal raises four issues. First, Richter claims that the Covenant is unenforceable as written because it is not ancillary to an employment contract or a contract for sale of the goodwill of a business. Second, Richter asserts that the Covenant, as modified by the trial court, is not reasonably limited as to time and geographical extent and imposes undue hardship upon him. Next, Richter argues

1. It is well settled that, as an equitable remedy, an injunction is only available if the party seeking relief has no adequate remedy at law. The Covenant contains a clause providing a formula for the computation of damages if Richter breached, as well as a clause providing that such damages are in addition to any other remedy Worldwide is entitled to, including injunctive relief. If parties specifically agree to a measure of damages in instances where exact computation of damages will be difficult, it is arguable that they have expressly provided an adequate remedy rendering injunctive relief inappropriate. Further, we note that it would be anomalous to allow private parties to expand the application of a court's equitable powers by contract. As neither party has addressed the issue, we deem it waived, and express no opinion as to the effectiveness of such a contract provision.

that the trial court improperly awarded Worldwide damages. Finally, Richter asserts that the doctrine of unclean hands prevents enforcement of the Covenant as modified by the trial court. Finding no merit to these assertions of error, we affirm.

The relevant facts of this case are as follows. Richter was employed by Worldwide as a "Marketer" since 1981 and became a 10% shareholder in Worldwide in 1982. (Reproduced Record [R.R.] at 120a–121a). In 1987, Richter was named vice-president of the South Atlantic Region and the Capital Division of Worldwide, consisting of the States of Delaware, Maryland, Virginia and Eastern West Virginia. (R.R. at 121a–122a). This promotion required Richter to move to the new work area; accordingly, in mid–1988, the Richters began to make arrangements to sell their Pennsylvania home and move to Maryland. (R.R. at 116a, 121a–123a).

In early 1988, Worldwide began a debt restructuring, and Richter and his wife, owning 10% of the outstanding shares of Worldwide, agreed to personally secure 10% of Worldwide's debt. (R.R. at 500a–501a). This obligation was met by the Richters giving a collateral mortgage on their Pennsylvania residence to Worldwide's bankers in the amount of $74,000.00. (R.R. at 503a).

Richter was terminated from his position with Worldwide on May 26, 1988. After termination, the Richters continued to own 10% of the outstanding shares of Worldwide and remained as guarantors for 10% of Worldwide's debts. (R.R. at 130a). The bank which held the mortgage on the Richters' Pennsylvania home was willing to transfer that mortgage to their new Maryland home so that the Richters could continue to serve as guarantors. (R.R. at 505a). Richter apparently no longer wished to act as Worldwide's guarantor. In return for Worldwide satisfying the mortgage on Richter's home which had guaranteed Worldwide's debt, Richter executed a Stock Redemption and Termination agreement. (R.R. at 130a). The agreement provided that Richter would be paid $25,000.00 for his shares of World-

wide stock and a further $25,000.00 for the Covenant not to compete. The money was to be paid in various installments over the two-year length of the Covenant. (R.R. at 12a). Richter consulted counsel prior to executing the agreement and signed the agreement against the advice of counsel. (R.R. at 125a, 700a).

Paragraph 6 of the Stock Redemption and Termination agreement provides in pertinent part as follows:

Restrictive Covenant. From May 23, 1988, the date on which Richter left the employ of Corporation [referring to Worldwide], and for a period of two (2) years thereafter, Richter agrees that Richter will not alone, or in any capacity with another, directly or indirectly, engage in any manner or capacity ... with the ownership, management, operation, financial backing or control in of any business similar to the type of business of the Corporation or dealing in medical cost containment or performing any of the services which Corporation now performs, or enter into or engage generally in any activity competitive with the business of Corporation within the geographic boundaries of any state within which Corporation conducts business, directly or through independent contractors, at any time hereunder (it being recognized and understood that the business of Corporation is not localized in Lansdale Pennsylvania or even in Pennsylvania and that therefore the geographical limits of this restrictive covenant be so broad as to be deemed to be against the public policy of the jurisdiction in whose courts enforcement of this restrictive covenant may be sought against Richter, the construing court shall grant Corporation the maximum restriction against Richter which is consistent with the public policy of the jurisdiction rather than refusing enforcement of this restrictive covenant as drafted on the basis that it is violative of the public policy of the jurisdiction); .... In the event that Richter violates any of the restrictions set forth herein, and as a result of such violation, Corporation institutes legal proceedings for injunctive or other relief, the two (2) year

restrictive period set forth herein shall be extended automatically for an additional period of two (2) years from the date of the final judgement of the court holding that Richter did violate said restriction ... Richter agrees that if any of the agreements set forth herein are violated, Corporation shall be entitled to an accounting and the payment over to it of all profits which Richter has realized as a result of any such violation....

(R.R. 14a–16a).

One month after signing the Covenant, Richter formed Island Consulting Services, Inc.; a company essentially performing the same medical cost containment services as Worldwide. (R.R. at 132a–133a). During 1988 and 1989, Richter contacted various present and former customers of Worldwide in Maryland soliciting their business for Island Consulting. (R.R. at 135a, 777a–780a).

The trial court determined that Island Consulting had earned profits of $45,000.00 from business conducted in Maryland or with former Worldwide customers during 1988–89. Worldwide has paid Richter the first $5,000.00 installment due under the Stock Redemption and Termination agreement. The trial court offset the $40,000.00 outstanding under the terms of the Stock Redemption and Termination agreement against the $45,000.00 damages suffered by Worldwide (such damages being the amount of Island Consulting profits arising from the breach as determined by the Covenant), resulting in an award of $5,000.00 in damages to Worldwide. (Supplementary adjudication, 2/15/90 at 1).

As an initial matter, we note that our scope of review in cases granting and continuing a preliminary injunction is confined to an inquiry of whether the trial court had reasonable grounds for its action. *Duggan v. 807 Liberty Avenue, Inc.*, 447 Pa. 281, 286–288, 288 A.2d 750, 753 (1972). The grant of an injunction will only be reversed for a clear error of law or a manifest abuse of discretion. *Pennsylvania Society for the Prevention of Cruelty to Animals v. Bravo Enterprises, Inc.*, 428 Pa. 350, 353–355, 237 A.2d

342, 345 (1968). With these standards in mind, we examine Richter's claims.

Richter's first claim of error is that the Covenant is unenforceable because it is not ancillary to an employment contract or a contract for the sale of the goodwill of a business. (Appellant's brief at 9–13, *citing George W. Kistler, Inc. v. O'Brien,* 464 Pa. 475, 347 A.2d 311 (1975) and *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957)). Richter goes on to assert that a restrictive covenant which is ancillary to a sale of stock is only enforceable if the sale involves a substantial equity interest or a franchise right. Richter contends that only if one of these property rights is transferred is there an exchange of the goodwill of a business which makes a restrictive covenant enforceable. (*Id., citing Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207 (1976) and *Alabama Binder and Chemical Corp. v. PICCO,* 410 Pa. 214, 189 A.2d 180 (1963)). We disagree.

The trial court expressly relied upon *Krauss v. M.L. Klaster & Sons, Inc.,* 434 Pa. 403, 254 A.2d 1 (1969) in enforcing the Covenant. We find *Krauss* to be on all fours with the case *sub judice.* Just as presented here, Krauss was a shareholder, employee and then officer of the corporation who, after termination, entered into an agreement, essentially for the sale of stock, which contained a restrictive covenant. *Id.,* 434 Pa. at 406, 254 A.2d at 2. Our Supreme Court, in a 6–to–1 decision, upheld the enforceability of the covenant. *Id.* Further support for the proposition that a restrictive covenant ancillary to a sale of stock is enforceable is found in *Albee Homes, Inc. v. Caddie Homes, Inc.,* 417 Pa. 177, 207 A.2d 768 (1965). The *Albee* Court stated that restrictive covenants ancillary to an employment contract are subject to a more stringent test of reasonableness than those ancillary to a buy-sell agreement. *Id.,* 417 Pa. at 185, 207 A.2d at 772. This clearly implies that restrictive covenants ancillary to a buy-sell agreement are enforceable. We do not dispute Richter's contention that restrictive covenants ancillary to sales of a substantial

equity interest or franchise rights are enforceable. *See, Piercing Pagoda* and *Alabama Binder, supra.* Nevertheless, those types of property interest are not indispensable prerequisites to the enforceability of a restrictive covenant.[2] The trial court did not commit a clear error of law nor abuse its discretion by enforcing the Covenant as ancillary to the sale of stock. Richter's first claim of error fails.

Richter's second assertion challenges the reasonableness of the Covenant as modified by the trial court. Richter claims that the injunction prohibiting him from competing with Worldwide in Maryland (except for the Eastern Shore) and from contacting any of Worldwide's former customers wherever located for a period of two years is inherently unreasonable as to both geographical extent and time. Richter also claims that the injunction would result in undue hardship. We disagree.

 A restrictive covenant should be drawn only as broad as is necessary to protect the legitimate business interests of the party seeking to enforce the covenant. *Sidco Paper Co. v. Aaron,* 465 Pa. 586, 593–595, 351 A.2d 250, 254 (1976). Richter asserts that the only legitimate business interest to be protected is Worldwide's Maryland customer base. It is true that the trial court referred to allowing Worldwide an opportunity "to reestablish itself in the Maryland market with a new representative." (Adjudication and *Decree Nisi* of 11/17/89 at 15). Nonetheless, the trial court also noted that Richter "was the key contact person servicing the plaintiff's clients in the capitol division." (*Id.,* at 14). Clearly, Worldwide has a legitimate business interest in those clients even if they are not geographically located in Maryland. *See, Boldt Machinery and Tools, Inc. v. Wallace,* 469 Pa. 504, 366 A.2d 902 (1976)

---

2. We find the cases cited by Richter distinguishable. *Kistler* dealt with a covenant which was unenforceable because it was a modification to a previously existing contract and no adequate consideration supported the modification. *Kistler, supra* 464 Pa. at 484–486, 347 A.2d at 316. In *Morgan's Home,* general covenants not to compete were held unenforceable as unreasonably broad, but specific covenants were enforced. *Morgan's Home, supra* 390 Pa. at 624–634, 136 A.2d at 843–847.

(enforcing covenant protecting employer's interest in customer relationships developed by employee who was sole contact with such customers as reasonable). The trial court obviously included former clients along with the Maryland market as Worldwide's legitimate business interests deserving protection.

■ Richter's claim as to an unreasonable time period also fails. The Covenant specifically called for an extension of time if Worldwide sought and was granted enforcement due to Richter's violations. Even were we to agree that such a length of time is harsh, we would enforce it. Richter had the benefit of advice of counsel which he ignored. "[T]here is nothing in the record to indicate that it was not part of a completely arms-length bargain between knowing and willing parties. Appellant must now live with the bargain which he struck, just as he would have to live with any other unadvantageous term that was used against him in a contract." *Krauss, supra* 434 Pa. at 407, 254 A.2d at 3.

■ Richter's final reasonableness argument is that the Covenant, as enforced, imposes an undue hardship upon him. Richter asserts that preventing him from competing in Maryland (except for the Eastern Shore) unduly burdens him because he now lives in Maryland. We disagree. When Richter moved to Maryland his sales responsibility included Virginia, Delaware and Eastern West Virginia as well as Maryland. Richter apparently believed that he would be able to service those areas from his Maryland location. That belief belies his present contention that he will be unable to pursue his trade at all due to the prohibition imposed by the injunction. Richter remains free to develop his business in the areas outside those denied him under the injunction so long as he does not contact those clients who are within Worldwide's legitimate business interest.

■ Restrictive covenants ancillary to a buy-sell agreement are not subjected to as rigorous a reasonableness

examination as those ancillary to an employment contract. *Albee, supra* 417 Pa. at 185, 207 A.2d at 772. We find the Covenant herein reasonable as modified by the trial court.

█ In a last-ditch effort to prevent enforcement of the Covenant, Richter raises the clean hands doctrine, asserting that Worldwide coerced him into signing the Covenant, and so is not entitled to enforcement in an equity action. Richter claims that he was forced to sign the agreement containing the Covenant so that Worldwide would satisfy the mortgage on his Pennsylvania home. The basis of Richter's claim is factually incorrect. Todd A. Alderfer, the commercial loan officer at the bank which held the mortgage on Richter's Pennsylvania home as a guarantee of Worldwide's debt, testified that the bank would be willing to substitute the Richter's new Maryland home as security for the Worldwide debt if the bank's collateral position would not deteriorate. (R.R. at 505a). The trial court obviously accepted this testimony over Richter's contention that the bank would not allow such a substitution.

Richter signed the agreement containing the Covenant after consulting with, and against the advice of, counsel. "[T]here can be no duress where the contracting parties each consult with counsel." *Carrier v. William Penn Broadcasting Co.*, 426 Pa. 427, 430–432, 233 A.2d 519, 521 (1967).[3] Richter's claim of unclean hands on the part of Worldwide fails.

█ The final issue raised by Richter deals with the amount of damages awarded to Worldwide. It is undisputed that there was an outstanding balance of $40,000.00 due Richter under the terms of the Stock Redemption and Termination Agreement. At trial, Worldwide presented

---

**3.** As we have determined that Richter has failed to make out a case of economic coercion by Worldwide, we need not address Worldwide's contention that actual physical harm or threats are necessary to prove duress. We note in passing that on different facts a case of economic duress or duress of goods may indeed make out a clean hands doctrine defense. *See, Black's Law Dictionary*, 5th Ed. p. 452 ("Where the act consists of a tortious seizure or detention of property from the person entitled to it, and requires some act as a condition of its surrender, the act is 'duress of goods'.").

evidence that Richter's Island Consulting firm had earned $45,000.00 in profits from business conducted in violation of the Covenant. Under the terms of the Covenant, this was the amount agreed upon as damages if Richter violated the Covenant. Richter claims that the trial court erroneously computed its total profits, not just those attributable to his violations of the Covenant. We disagree. The decree is clear that only those receipts attributable to former Worldwide customers were used to compute Island Consulting's profits for the measure of damages. (Adjudication and *Decree Nisi*, 11/17/89 at 10–11).

Damages arising out of a breach of a covenant not to compete are difficult to compute with precision. *Aiken Industries, Inc. v. Estate of Wilson*, 477 Pa. 34, 41, 383 A.2d 808, 811–812 (1978) (plurality). There was sufficient evidence for the trial court to determine the amount of profit earned by Island Consulting which was attributable to Richter's violations of the Covenant. Richter agreed that this would be the measure of damages Worldwide would receive if he breached the terms of the Covenant (in effect, a liquidated damages provision). Just as Richter has agreed to the extension of time of the Covenant, he has agreed to this measure of damages; this agreement is enforceable. *Krauss, supra* 434 Pa. at 407, 254 A.2d at 3. As these damages have been proven by sufficient evidence, they are not based upon mere speculation or guess.

Order affirmed.