OMICRON SYSTEMS, INC., Appellee

v.

Fred WEINER, Appellant.

Superior Court of Pennsylvania.

Argued Aug. 31, 2004.
Filed Oct. 7, 2004.

Ira A. Rosenau, Philadelphia, for appellant.

James P. Golden, Philadelphia, for appellee.

Before: MUSMANNO, OLSZEWSKI, and POPOVICH, JJ.

OLSZEWSKI, J.

¶ 1 Fred Weiner (appellant) appeals the judgment of the Court of Common Pleas of Philadelphia County (Cohen, J.), finding that appellant violated the non-compete and confidentiality agreements with Omicron Systems (appellee). The trial court awarded Omicron $238,000.00 in liquidated damages and $185,916.50 in attorney's fees. We affirm the $238,000.00 award and reverse the $185,916.50 award.

¶ 2 In 1987, Omicron Systems, an information technology company, hired Fred Weiner. In 1993, in connection with an "Executive Management Plan," Weiner signed a document entitled "Confidentiality, Discoveries, Restrictive Covenant and Release Agreement," which, *inter alia,* prohibited him from disclosing confidential Omicron materials and from leaving Omicron to work for a competitor company.

¶ 3 In 2001, Proscape Technologies and Mr. Weiner entered into negotiations for employment. Ultimately, Mr. Weiner left Omicron and began working for Proscape in July of 2001. Omicron promptly filed a writ of summons in August of 2001, followed by a civil complaint alleging violations of the above agreement in November of 2001.

¶ 4 In December of 2001, Omicron, Proscape, Mr. Weiner, Randy Pritzker, and Valerie DeRusso entered into a "Confidentiality Agreement and Release", which permitted the discovery of confidential Proscape information by Omicron and released Proscape of all liability from legal action arising out of Mr. Weiner's employment with Proscape.

¶ 5 After a bench trial in April of 2003, the trial court found that Mr. Weiner breached the 1993 agreement, ordered Mr. Weiner to pay damages in the amount of $238,000.00 [1] to Omicron, as well as attorney's fees and costs in the amount of $185,916.50.[2]

¶ 6 Mr. Weiner raises six issues on appeal: (1) whether Omicron proved that it suffered actual harm as a result of Mr. Weiner's move to Proscape; (2) whether the trial court improperly used "equitable accounting" in calculating the award of damages; (3) whether the award of attorney's fees was proper; (4) whether the non-compete clause was enforceable, and if so, whether the clause was breached; (5) whether Mr. Weiner breached his confidentiality obligations to Omicron; and, (6) whether Omicron waived any and all claims against Mr. Weiner by signing the December 2001 "Confidentiality Agreement and Release." Appellant's brief, at ii.

¶ 7 Our standard of review in equity matters is well settled.

> In equity matters, appellate review is based on a determination by the appellate court of such questions as whether (1) sufficient evidence supports the findings of the judge; (2) the factual inferences and legal conclusions based on those findings are correct; [and] (3) there has been an abuse of discretion or an error of law. Generally, in an appeal from a trial court sitting in equity, the standard of review is rigorous. The function of this Court on an appeal from an adjudication in equity is not to substitute its view for that of the lower tribunal; our task is rather to determine whether "a judicial mind, on due consideration of all the evidence, as a whole,

---

1. This figure is the amount Mr. Weiner received in gross salary during the twenty-two months of his employment with Proscape prior to the bench trial.

2. This figure represents $153,141.50 in attorney's fees, $10,000.00 in arbitration costs, and $22,775.00 in additional costs.

could reasonably have reached the conclusion of that tribunal."

*Hess v. Gebhard & Co.*, 570 Pa. 148, 808 A.2d 912, 920 (2002) (citations omitted). Further, our review is plenary when the question is one of law. *Id.* (citation omitted).

¶ 8 We begin with Mr. Weiner's sixth claim.

## OMICRON/PROSCAPE RELEASE AGREEMENT

■ ¶ 9 Mr. Weiner argues that the December 2001 release agreement not only released Proscape from all liability arising from his change of employment, but released Mr. Weiner as well.

¶ 10 The clause at issue in the release agreement is paragraph XIV.

XIV. **Release.** Based upon the representation of Timothy Healy that as of June 29, 2001, he, and, to the best of his knowledge, Proscape Management, were not aware of the existence, or terms and conditions of any agreement between Omicron and Mr. Weiner containing restrictive covenant and/or confidentiality language that would prevent Mr. Weiner from working for Proscape, Omicron and PBR [3], for good and sufficient consideration, do hereby remise, release and forever discharge Proscape, from any and all claims, causes of action, suits, judgments, rights, liability, damages and demands of any kind whatsoever, in law or equity, known or unknown that Omicron and PBR now have, ever had, or may at any time hereafter have against Proscape, arising out of or in any way connected with or related to Weiner's employment contract with Omicron and PBR, Proscape's employment of Weiner or any actions taken by Weiner as an employee of Proscape, including but not limited to, claims under any federal, state or local law or regulation, or under any common law theory, including but not limited to, intentional or negligent (tortuous) interference with contractual/business relations, breach of contract, or any other common law theory, through September 13, 2001. Omicron acknowledges and agrees that this Release covers any and all claims it could assert against Proscape for tortuous interference with contractual relations relating to Proscape's employment of Mr. Weiner, and represents that it will not file such a claim at anytime in the future.

Confidentiality Agreement and Release (hereinafter "Proscape Agreement"), dated December 2001, at 11–12.

¶ 11 Mr. Weiner's argument that "Proscape," as used in this agreement, includes him, and that Omicron waived its claims against him has superficial appeal. At the beginning of the agreement, Proscape Technologies includes its "respective parents, affiliates, subsidiaries and related organizations, its and their officers, directions, *employees*, trustees, agents, representatives, predecessors, successors and assigns." Proscape Agreement, at 1 (emphasis added). Because Mr. Weiner was an employee of Proscape at the time Omicron signed the agreement, it appears that Omicron did waive its claims against Mr. Weiner for breach of contract.

■ ¶ 12 A more thorough reading of the entire agreement, however, indicates otherwise.

In Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language. Parties with possible claims

---

**3.** PBR Consulting Group, Inc. is part of Omicron Consulting, Inc. For the purposes of this appeal, Omicron and PBR are the same corporation.

may settle their differences upon such terms as are suitable to them. They may agree for reasons of their own that they will not sue each other, or anyone else, for the event in question. When the parties to a release agree not to sue each other or anyone else for a given event, this can effect a discharge of others who have not contributed consideration for the release. This is true even if the language of the release is general, releasing, for example, "any and all other persons" rather than specifically naming the persons released. However improvident the release may be or subsequently prove to be for either party, their agreement, absent fraud, accident or mutual mistake, is the law of their case. If such a release can be nullified or circumvented, then every written release and every written agreement of any kind, no matter how clear and pertinent, can be set aside whenever one of the parties changes its mind or the injured party receives an inadequate settlement.

*Taylor v. Solberg*, 566 Pa. 150, 778 A.2d 664, 667–68 (2001) (citations omitted). "The courts of Pennsylvania have traditionally determined the effect of a release using the ordinary meaning of its language *and* interpreted the release as covering only such matters as can fairly be said to have been within the contemplation of the parties when the release was given." *Fortney v. Callenberger*, 801 A.2d 594, 597 (Pa.Super.2002) (emphasis in original) (citations and quotation marks omitted).

¶ 13 In the introductory clauses, the parties acknowledge that "on or about August 9, 2001, Omicron ... instituted a civil action against Mr. Weiner," and that "Mr. Weiner is currently employed by Proscape." Proscape Agreement, at 1. Further, the parties entered into the agreement because "Omicron seeks to obtain from Proscape documents and materials that Proscape considers to be or to contain confidential ... information as part of the Litigation [against Mr. Weiner]," and "Proscape desires to preserve the confidential ... nature of the requested information." Proscape Agreement, at 2. These, and other introductory clauses, indicate that Omicron sought to obtain documents from Proscape during discovery and in the course of Omicron's suit against Mr. Weiner. Omicron and the other parties to the agreement contemplated only discovery of confidential documents from Proscape. They did not contemplate ending the suit against Mr. Weiner. Accordingly, the trial court properly found that Omicron did not waive its right to enforce the non-compete and confidentiality agreements against Mr. Weiner.[4]

## NON–COMPETE AGREEMENT

¶ 14 We now turn to the non-compete agreement.

Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer. However, restrictive covenants are not favored

---

4. Omicron argues that the release was induced by fraud because the release was based "on the representation of Timothy Healy that as of June 29, 2001, he, and, to the best of his knowledge, Proscape Management, were not aware of the existence, or terms and conditions of any [restrictive] agreement between Omicron and Mr. Weiner." Proscape Agreement, at 11. Omicron contends that Timothy Healy from Proscape was aware of the non-compete and confidentiality agreements between Mr. Weiner and Omicron prior to June 29, 2001, and they produced an e-mail from Mr. Weiner to Mr. Healy, dated June 4, 2001, mentioning such agreements. *See* Plaintiff's Trial Exhibit, no. 17. Because we find that the lower court properly construed the agreement in favor of Omicron, we will not discuss whether the agreement was induced by fraud.

in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.

*Hess,* 808 A.2d at 917 (citations and quotation marks omitted). Such agreements are enforceable "if they are reasonably limited as to duration of time and geographical extent." *Jacobson & Co. v. International Environment Corp.,* 427 Pa. 439, 235 A.2d 612, 620 (1967) (citation and quotation marks omitted).

> Fundamental, then, to any enforcement determination is the threshold assessment that there is a legitimate interest of the employer to be protected as a condition precedent to the validity of a covenant not to compete. Generally, interests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills. If the covenant is inserted into the agreement for some other purpose, as for example, eliminating or repressing competition or to keep the employee from competing so that the employer can gain an economic advantage, the covenant will not be enforced.

*Hess,* 808 A.2d at 920–21 (citations omitted).

¶ 15 In the instant case, the covenant not to compete states,

> Employee [Mr. Weiner] shall not, except with the express prior written consent of the Company [Omicron], in any capacity, directly or indirectly, whether as employee, owner, partner, agent, director, officer, shareholder or in any other capacity in the broadest sense, for his/her own account or for the benefit of any Person in any business providing similar or related services of Company ... [e]stablish, engage, own, manage, operate, join or control, participate or be connected with the establishment, ownership, management, operation, or control of, or be an employee, salesman, owner, partner, agent, director, officer, shareholder or representative of, or be a consultant to, or be connected in any manner with, for his/her own account or for the benefit of any Person, any business in competition with Company throughout the entire world.

Confidentiality, Discoveries, Restrictive Covenant and Release Agreement (hereinafter "Omicron Agreement"), 12/10/03, at 4–5. Essentially, the agreement prohibits Mr. Weiner from being employed by a competitor of Omicron for two years after the termination of his employment with Omicron. There is no question that Mr. Weiner left Omicron and began to work for Proscape within the two-year period. The only issues are whether Omicron had a legitimate purpose and whether Proscape is "in competition with" Omicron.

¶ 16 The Omicron Agreement states that Mr. Weiner "acknowledges that the restrictions contained above, and in view of the nature of the business in which the Company is engaged, are reasonable and necessary in order to protect the legitimate interests of the Company." Omicron Agreement, at 5. While the Omicron Agreement does not list Omicron's "legitimate interests," we will not disturb the parties' agreement that Omicron's interests were and are legitimate.

¶ 17 We now turn to the question of whether Omicron and Proscape are in competition with each other. After searching case law, we could not find an adequate definition of "competition." We therefore turn to the dictionary for guidance. Competition is: the "effort or action of two or more commercial interests to obtain the same business from third parties," BLACK'S LAW DICTIONARY 278 (7th ed.1999); "the effort of two or more par-

ties acting independently to secure the business of a third party by offering the most favorable terms," WEBSTER'S NEW COLLEGIATE DICTIONARY 227 (1980). A competitor is defined as "one selling or buying goods or services in the same market as another." WEBSTER'S NEW COLLEGIATE DICTIONARY 228 (1980).

¶ 18 Omicron asserts that it is in competition with Proscape, while Mr. Weiner asserts that Omicron and Proscape are *not* competitors. After reviewing the record, we are convinced that the trial court correctly found that Proscape and Omicron are competitors.

¶ 19 Omicron is an information technology (IT) consulting firm. Essentially, customers hire Omicron for a variety of IT needs, from developing IT "solutions" to implementing those solutions. Omicron's focus is general; it is able to handle many different IT problems.

¶ 20 Proscape, on the other hand, has only one product: its marketing and sales effectiveness (MSE) software. Proscape sells this software to customers and provides installation assistance and technical support. Proscape customers can customize the outward appearance of the program to meet their sales needs. These changes are merely cosmetic; the essential computer code of the program remains untouched.

¶ 21 Initially, these two companies appear to be in completely different, although related, markets. A deeper analysis, however, reveals that these two companies are not that different, and in fact, are in competition with each other. Proscape claims that it has a solution to a customer's sales needs, and that solution is its MSE software. Omicron states that it too has a solution, and that solution is analyzing the needs of the customer and providing the best solution possible by either creating a new program from scratch or utilizing existing software on the market. While Omicron does not exclusively solve marketing and sales problems, it can and does solve those types of problems. It is in this manner that both companies are in competition with each other. Both companies offer a solution to marketing/sales problems.

¶ 22 The Chief Financial Officer of Proscape, John Miller, provided a persuasive analogy. "If I was going to go out and buy a Porsche I would go to the Porsche dealership if I wanted a Porsche right out of the box. Otherwise, I'd go to Joe Porsche mechanic and have him build me one from scratch at twice the price." N.T., 4/21/03, at 41. This example, given on direct examination by Mr. Weiner's counsel, persuades us that Proscape is in competition with Omicron. Just because the Porsche dealership provides a prepackaged product does not mean that Joe Porsche cannot and does not compete for the dealer's business. The same is true of Proscape and Omicron.

¶ 23 Mr. Weiner centers his argument around the fact that the Omicron executives: (1) have not previously heard of Proscape; and (2) were unable to provide evidence that Proscape and Omicron competed for the same client. These arguments have no merit. The testimony clearly indicated that companies do not know who their rivals are for any specific job. For example, Valerie DeRusso, Vice President and Chief Operating Officer of Omicron, stated "I don't know who my competitors are." N.T., 4/21/03, at 25. Further, Randy Pritzker, President and Chief Executive Officer of Omicron, testified, "in our business you most often do not know who your competitors were. It would be almost impossible that I would have knowledge of it, but it doesn't mean it's not possible that it happened." N.T., 4/14/03, at 99.

¶ 24 Mr. Weiner further asserts that the lack of common customers negates a finding of competition. This argument also lacks merit. It stands to reason that companies in competition with each other would not have a common customer base. A company buys Coke or Pepsi, Apple or Windows, but rarely both.

¶ 25 Accordingly, the trial court properly found that Proscape and Omicron were competitors, and that Mr. Weiner violated his contract with Omicron when he left Omicron and took a position at Proscape.

## CONFIDENTIALITY AGREEMENT

¶ 26 Mr. Weiner next argues that the trial court incorrectly found that he violated the confidentiality agreement when he used a few paragraphs in Proscape proposals that were taken verbatim from Omicron proposals. He argues that these paragraphs contain only general information and not confidential information.

¶ 27 The Omicron Agreement prohibits the disclosure and dissemination of "any trade secrets or confidential proprietary information of the Company or of any of the Company's clients." Omicron Agreement, at 2.

¶ 28 To guide us in our discussion, we consider the definition of a "trade secret."

The Pennsylvania Supreme Court has adopted the definition of "trade secret" that is set forth in comment b to section 757 of the *Restatement of Torts:*

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and gives him an opportunity to obtain an advantage over competitors who do not know or use it."

Some factors that a court may consider in determining whether information qualifies as a trade secret include:

(1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated by others.

*Dibble v. Penn State Geisinger Clinic, Inc.,* 806 A.2d 866, 871 (Pa.Super.2002) (citations omitted).

¶ 29 Mr. Weiner admits to copying various paragraphs from Omicron proposals and using them in Proscape proposals. These paragraphs were about project "kickoff" meetings, client responsibilities, and change management. "Mr. Weiner testified that, from materials on his home computer, he cut-and-paste[d] those non-confidential sections from old Omicron proposals into the Clorox [Proscape] proposal." Appellant's brief, at 25 (citations omitted). Mr. Weiner asserts that these paragraphs were nothing more than standard concepts in complex proposals. "There is nothing unique or special about these concepts or the words that describe the concept. Indeed, these topics would be discussed for the sale of virtually any somewhat complex product or service." Appellant's brief, at 27.

¶ 30 Omicron executive Valerie DeRusso testified that the language from its proposals is part of an overall methodology called Eagle methodology.

The Eagle project management methodology is the basis for our differentiating factor in our competitiveness. We use this as our tool to show that we have a more comprehensive consulting group and that we take into consideration the needs of our clients and the needs of Omicron together. We use it, we talk about it in our proposals. We actually get hired based on that methodology because it's so different from others.

\* \* \*

The scope of work is the part of our proposal that actually outlines the project, our assumptions, the actual work we are going to do, how we are going to manage it, what the client responsibilities are, what the deliverables are and how we do change management.

We believed, and we still believe today that these are the major points of a proposal that if you actually explain them in a certain way will give you your competitive advantage.

\* \* \*

The significance of that language is basically how—it's not that language in particular but it's the methodology behind that language. Many, many consulting companies and other companies will talk about project management, kick-off meetings, change management, client responsibilities. What we have done is we have taken it a step further. We have had clients hire us based on those words in that proposal specifically because of our project management pieces.

N.T., 4/15/03, at 59–62.

¶ 31 Randy Pritzker testified that the copied paragraphs are some of the most important paragraphs in the proposal.

[T]hose are some of the most critical paragraphs in proposals[.] I don't believe it would be expected that language would be exact and if the same person would see it is identical, and they are

not the opening kinds of marketing paragraphs, they are critical paragraphs that they review intensely.

N.T., 4/15/03, at 20.

¶ 32 Valerie DeRusso also testified that the Eagle methodology could not easily be reproduced and that it took Omicron time and money to develop it.

I believe that a methodology for project management can be made if someone puts the effort in to do it. Can it be exactly like ours, no.

[MR. WEINER'S ATTORNEY]: Your deposition, page 79: What is it about this methodology that is so special that someone else couldn't sit down like you and Randy and not figure out how to put these alerts and troubleshooting in; what is it that's so special about the way you did it? ANSWER: Someone would have had to be in the consulting business and have done the projects and had the experience to understand where the pitfalls are. And if they had all of that and they wanted to invest one year of their life and a couple hundred thousnad [sic ] dollars, I'm sure they could come up with most of the insight we had."

Do you remember saying that?

[DeRUSSO]: Yes.

N.T., 4/15/03, at 71–72. Similarly, Randy Pritzker testified that the

Eagle methodology was prepared with the work of probably my top four to six employees over that year, year and-a-half that we worked on it. Each month, a week a month … I took them away. This is the longest loss of billable time . . . .

As I've said, in addition, we worked on refining it for the next year's work. So, therefore, I would say the cumulative time, forget printing and training costs, we have probably spent clearly north of

200[to] 250,00[0] to put out the original version.... I would say we'll probably spend another 200,000 over the years that follow. It's been in play six, seven years keeping it current and training people. So I would imagine initially 250,000. I imagine over time we've put another $200,000 worth of cumulative time in that. More importantly, it's the basis upon which we compete.

N.T., 4/14/04, at 79–80.

¶ 33 Finally, Omicron took steps to protect the information contained in the proposals. Randy Pritzker testified that when Omicron releases a proposal, Omicron usually has the customer sign a confidentiality agreement.[5] N.T., 4/14/03, at 114.

¶ 34 The above testimony shows that Omicron invested much time and money into the development of its Eagle methodology, from which the proposal language derived. Further, the methodology was developed by Omicron's top employees with years of experience in the consulting field. While it would be possible to reproduce the concepts in the methodology, a company, such as Proscape, would need the requisite expertise in IT consulting, as well as invest significant amounts of time and money into developing the methodology. Finally, Omicron took steps to protect the information in its proposals by customarily having clients sign confidentiality agreements. Accordingly, the paragraphs copied from Omicron proposals were "trade secrets," which fell under the confidentiality provisions of the Omicron agreement prohibiting Mr. Weiner from disclosing the information. By using the Omicron proposal language in Proscape proposals, Mr. Weiner violated the confidentiality clause of the Omicron agreement.

## DAMAGES

▮▮▮▮ ¶ 35 While we have found that Mr. Weiner did breach both the confidentiality agreement and the non-compete agreement, we must also find that Omicron proved damages. "Three elements are necessary to plead properly a cause of action for breach of contract: [ (1) ] the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269, 1272 (Pa.Super.2002) (citations and quotation marks omitted). Mr. Weiner alleges that Omicron did not show proof of damages and that any damages actually incurred were nominal. Mr. Weiner argues that Omicron could not prove damages because Omicron suffered no actual harm: "Omicron failed to present any evidence that, as a result of the alleged breaches, it lost any customers, lost any suppliers or partners, lost a cent in revenues or suffered any other identifiable harm." Appellant's brief, at 35.

▮▮▮▮ ¶ 36 Our standard when we review claims involving damage awards is well settled.

The general rule in this Commonwealth is that the plaintiff bears the burden of proof as to damages.

The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses.

---

**5.** Randy Pritzker also admitted that a confidentiality agreement is not always signed by the customer. "Q. Do you have a confidentiality agreement every time you submit a proposal or bid? A. Not every time but often." N.T., 4/14/04, at 114.

Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*Judge Technical Services, Inc. v. Clancy*, 813 A.2d 879, 885 (Pa.Super.2002) (citation omitted).

■■■ ¶ 37 The trial court found that Mr. Weiner breached the Omicron Agreement, and therefore, it awarded liquidated damages in the amount of $238,000.00 (the amount of gross salary paid to Mr. Weiner by Proscape up to the beginning of trial). The trial court justified this award based upon the liquidated damages clause in the Omicron Agreement.[6]

The Employee therefore acknowledges that, in the event of his/her violation of any of these restrictions, the Company shall be entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief *as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such violation*, which rights shall be cumulative and in addition to any rights or remedies to which the Company may be entitled.

Omicron Agreement, at 6 (emphasis added). This clause alone justifies the award of $238,000.00 in damages.

Damages arising out of a breach of a covenant not to compete are difficult to compute with precision. There was sufficient evidence for the trial court to determine the amount of profit earned by [appellant's newly formed company] which was attributable to [appellant's] violations of the Covenant. [Appellant] agreed that this would be the measure of damages [appellee] would receive if he breached the terms of the Covenant (in effect, a liquidated damages provision). Just as [appellant] has agreed to the extension of time of the Covenant, he has agreed to this measure of damages; this agreement is enforceable. As these damages have been proven by sufficient evidence, they are not based upon mere speculation or guess.

*Worldwide Auditing Services, Inc. v. Richter*, 402 Pa.Super. 584, 587 A.2d 772, 777–78 (1991) (citations omitted). Because the liquidated damages clause is enforceable, and Mr. Weiner's salary at Proscape was proven by sufficient evidence,[7] the trial court properly awarded $238,000.00 in damages to Omicron.

### EQUITABLE ACCOUNTING

■■■ ¶ 38 Mr. Weiner next argues that "equitable accounting" is not a permissible remedy. This argument is without merit. Mr. Weiner agreed to an "equitable accounting" when he signed the covenant not to compete. This agreement is enforceable.

■■■ ¶ 39 Mr. Weiner also contends that the damages award is inappropriate, even as liquidated damages, because the ultimate award is unreasonably large. We fail to see how the $238,000.00 liquidated damages award is "unreasonably large," especially given our previous decision in *Worldwide Auditing, supra.*

---

6. The liquidated damages clause applies only to breaches of the covenant not to compete, as this clause is included in the "Restrictive Covenant" section of the agreement.

7. Mr. Weiner testified that his yearly salary was and is $130,000.00. N.T., 4/10/03, at 63–64.

¶ 40 Finally, Mr. Weiner argues under this heading that the trial court incorrectly calculated the award by using his gross (pre-tax) income rather than his net (post-tax) income. He asserts that only "benefits" are properly the subject of the equitable accounting, and that "benefits" are "something of advantage to, or profit to, the recipient." Appellant's brief, at 44 (citing *Cheltenham Twp. v. Cheltenham Twp. Police Dept.*, 11 Pa.Cmwlth. 348, 312 A.2d 835 (1973)). Mr. Weiner interprets the words "benefits" and "profit" to mean only his net or take-home pay. After further review, however, we must ultimately rule against Mr. Weiner. Since Mr. Weiner agreed to an equitable accounting of all earnings, profits and other benefits, the trial court's use, in its calculations, of his earnings, rather than his net income, was proper. We could not find any case law directly on point, and considering the lack of precedential case law in his brief, neither could Mr. Weiner. We do, however, find our Supreme Court's decision in *Girard Trust Corn Exchange Bank v. Philadelphia Transportation Co.*, 410 Pa. 530, 190 A.2d 293 (1963), to be helpful. In *Girard Trust,* the trial court instructed the jury that, when fixing damages, they should deduct income taxes from the gross earnings of the decedent. Essentially, the trial court permitted the jury to consider only the decedent's net income. Our Supreme Court held that "in fixing damages for the determination of decedent's earning capacity, the income tax consequences of the matter should not be taken into consideration." *Id.* at 298 (citation omitted). Though *Girard Trust* focused on the propriety of considering tax consequences in calculating awards in wrongful death actions, we see no reason for a different outcome in the instant case. Accordingly, the trial court appropriately ordered damages of $238,000.00, which amounted to Mr. Weiner's gross income, not his net income.

## ATTORNEY'S FEES

¶ 41 We finally review the propriety of the award of attorney's fees. Mr. Weiner argues that the trial court's award of attorney's fees was improper because: (1) attorney's fees may not be awarded in an equity action; (2) Omicron failed to specifically pray for attorney's fees in its amended complaint; (3) the trial court failed to hold an evidentiary hearing; and, (4) the trial court awarded fees that were outside the scope of the Omicron Agreement. We agree with Mr. Weiner that the trial court improperly imposed attorney's fees because Omicron failed to properly preserve the claim in its amended complaint.

¶ 42 Omicron demanded the following relief in its amended complaint:

WHEREFORE, Omicron requests that the Court issue a declaration that Weiner has breached the Restrictive Covenant Agreement.

WHEREFORE, Omicron requests that the Court enjoin Weiner, for a period of two years (excluding the time that Weiner worked for Proscape), from continuing his employment relationship with Proscape Technologies.

WHEREFORE, Omicron requests that the Court direct Weiner to provide an accounting of all earnings, profits and other benefits arising from his breach of the restrictive covenant in the Restrictive Covenant Agreement, and that he be directed to pay those earnings, profits and other benefits to Omicron.

Omicron Amended Complaint, 4/2/02, at 10, 11, and 12 (respectively).

¶ 43 Omicron did not demand attorney's fees (even though the contract permitted

such a request for attorney's fees [8]) in its amended complaint. To cure this deficiency, Omicron urges us that courts sitting in equity are permitted to grant relief, despite the fact that the pleadings did not originally ask for such relief. In support of this proposition, Omicron cites to *Annenberg v. Commonwealth*, 562 Pa. 581, 757 A.2d 338 (2000). *Annenberg* allowed relief not specifically requested in the original complaint.

> [T]he court may grant any appropriate relief that conforms to the case made by the pleadings although it is not exactly the relief which has been asked for by the special prayer.... ***Under the prayer for general relief, the plaintiffs are entitled to such relief as is agreeable to the case made in the bill, though different from the specific relief prayed for.***

*Meth v. Meth*, 360 Pa. 623, 62 A.2d 848, 849 (1949) (citation omitted) (emphasis added) (quoted in *Annenberg*, 757 A.2d at 348; and *Lower Frederick Twp. v. Clemmer*, 518 Pa. 313, 543 A.2d 502, 512 (1988)). Omicron conveniently failed to recognize the highlighted portion from *Annenberg/Clemmer/Meth* that requires the complaint to contain a general prayer of relief. Omicron's amended complaint does not contain a general prayer for relief. Further, the amended complaint does not mention the indemnification clause that contains Omicron's contractual right to attorney's fees. Without a general prayer of relief or a specific prayer for attorney's fees in the amended complaint, we must find that the trial court erred in awarding Omicron attorney's fees.

## CONCLUSION

¶ 44 For the reasons stated above, we reverse the trial court's award of attorney's fees to Omicron. In all other respects we affirm.

¶ 45 Judgment REVERSED only as to the award of attorney's fees, and in all other respects, AFFIRMED. Jurisdiction relinquished.

¶ 46 MUSMANNO. J., Concurs in the Result.

8. *See* Omicron Agreement, at 7.