**Frederick J. ROTH and Debra A. Roth, Plaintiffs,**

v.

**CABOT OIL & GAS CORPORATION, Gassearch Drilling Corporation, Defendants.**

**No. 3:12–cv–898.**

United States District Court, M.D. Pennsylvania.

Jan. 30, 2013.

Jose A. Almanzar, Tate J. Kunkle, Napoli Bern Ripka Shrolnik & Associates, LLP, New York, NY, William S. Berman, Napoli Bern Ripka, LLP, Marlton, NJ, for Plaintiffs.

Amy L. Barrette, Michael P. Gaetani, Fulbright & Jaworski LLP, Canonsburg, PA, Andrew John Torrant, Fulbright & Jaworski L.L.P., Houston, TX, for Defendants.

### MEMORANDUM & ORDER

JOHN E. JONES III, District Judge.

Presently pending before the Court is the Motion to Dismiss (doc. 50) filed by Defendants Cabot Oil & Gas Corporation and GasSearch Drilling Corporation seeking dismissal of the Plaintiffs' First Amended Complaint (doc. 1) in its entirety. The Motion has been fully briefed and is thus ripe for our review. For the reasons articulated herein, we will grant in part and deny in part the said Motion.

## I. PROCEDURAL HISTORY

Plaintiffs Frederick J. and Debra A. Roth commenced the above-captioned action against Defendants Cabot Oil & Gas Corporation and GasSearch Drilling Corporation by filing a Complaint in the Court of Common Pleas of Susquehanna County, Pennsylvania, where it was docketed at 2012–324CP. (*See* Doc. 1, Ex. A). The Defendants removed the action to this Court by filing a Notice of Removal (doc. 1) on May 14, 2012. The Defendants responded with a Motion to Strike (doc. 13) and Motion to Dismiss (doc. 15) on June 25, 2012, both of which were filed contemporaneously with supporting briefs. Thereafter, on July 20, 2012, the Defendants file a Motion for a *Lone Pine* Order (doc. 33) and supporting papers. Therein, the Defendants asserted that the nature of this case, in particular the complex factual predicate and the potential for expensive and time-consuming discovery, warrants a modified case management track requiring the Plaintiffs to make a *prima facie* showing of exposure, injury, and causation before proceeding to discovery.[1]

On July 31, 2012, the Court convened a telephonic case management conference with the primary purpose of discussing the *Lone Pine* motion. In an attempt at conciliation, and to the agreement of the parties, the Court directed that the parties confer and attempt to resolve the issue without judicial intervention. The Court advised that the filing of opposition papers would indicate that the parties deemed an amicable resolution to be unattainable. The Court also granted Plaintiffs' oral request for leave to file an Amended Complaint, which Plaintiffs subsequently filed on August 6, 2012 (doc. 42), effectively mooting the then pending Motion to Strike and Motion to Dismiss. On August 17, 2012, Plaintiffs filed their opposition papers to the *Lone Pine* Motion (doc. 45), indicating to the Court that the parties were unable to resolve the issue amongst themselves. We thus referred the *Lone Pine* Motion to Magistrate Judge Martin C. Carlson for resolution. (Docs. 47–48).

---

1. Such an order was first adopted in the seminal case of *Lore v. Lone Pine Corporation,* 1986 WL 637507, at *1–2, 1986 N.J.Super. LEXIS 1626, at *3 (N.J.Super.1986). Since that time, *Lone Pine* orders have issued in both state and federal tribunals across the United States.

After an unavailing telephonic conference call with the parties, Magistrate Judge Carlson issued a Memorandum and Order (doc. 57) denying the Defendants' request for a *Lone Pine* order, finding it preferable instead to remain within the dictates of the rules of civil procedure and the standard case management track.

On September 4, 2012, the Defendants filed the instant Motion to Dismiss (doc. 50) contemporaneously with a supporting brief (doc. 51). The Plaintiffs filed opposition papers (doc. 55) on October 9, 2012, and on November 14, 2012, the Defendants filed a reply brief (doc. 62). The Motion to Dismiss is thus fully ripe for the Court's review.

## II. STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir.2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir.2002)). In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached or submitted with the complaint, ... and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir.2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). While a complaint attacked by a Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level...." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir.2007) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Accordingly, to satisfy the plausibility standard, the complaint must indicate that defendant's liability is more than a "sheer possibility." *Iqbal*, 129 S.Ct. at 1949. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

Under the two-pronged approach articulated in *Twombly* and later expounded upon and formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557, 127 S.Ct. 1955. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a Rule 12(b)(6) motion to dismiss. *Iqbal*, 129 S.Ct. at 1950. Next, the district court must identify "the 'nub' of the ... complaint—the well-pleaded, nonconclusory factual allegation[s]." *Id.* Taking these allegations as true, the district judge must

then determine whether the complaint states a plausible claim for relief. *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips,* 515 F.3d at 231 (citing *Twombly,* 550 U.S. at 556–57, 127 S.Ct. 1955). Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

## III. STATEMENT OF FACTS

In accordance with the standard of review applicable to a Rule 12(b)(6) motion, the following facts are derived from Plaintiffs' Amended Complaint (doc. 42) and accepted as true for purposes of resolving the instant Motion.

Plaintiffs Frederick J. and Debra A. Roth are husband and wife and are the owners of property located at 2638 SR 3021 in Springville, Pennsylvania ("the Property"), where they have resided for more than thirty-five (35) years. (Doc. 42, ¶¶ 2–3). Defendant Cabot Oil and Gas Corporation ("Cabot") is a Delaware corporation headquartered in Houston, Texas which engages in various oil and gas exploration and production activities in the Commonwealth. (*Id.* ¶ 5). Defendant GasSearch Drilling Services Corporation ("GasSearch") is located in Parkersburg, West Virginia and is a wholly owned subsidiary of Cabot which also engages in the drilling and servicing of oil and gas wells. (*Id.* ¶ 6). At all times relevant to this action, Defendants owned and operated several natural gas wells and engaged in natural gas exploration and production in the Dimock and Springville Townships of Susquehanna County, Pennsylvania. (*Id.* ¶ 10–11). Gas wells drilled, owned, and operated by the Defendants include, among others, D. Berry # 2 Gas Well (API # 37–115–20238), D. Berry # 3 Gas Well (API # 37–115–20367), D. Berry # 4 Gas Well (API # 37–115–20368), and D. Berry # 5 Gas Well (API # 37–115–20369) (collectively "Wells"). (*Id.*). These Wells were located less than 1,000 feet from the Plaintiffs' Property and residence. (*Id.* ¶ 13).

A representative of Cabot visited the Plaintiffs' Property in or about March of 2008 for the purpose of executing an oil and gas lease agreement ("Gas Lease") in order to obtain the legal right to drill on or near Plaintiffs' Property and extract natural gas from the Property. (*Id.* ¶¶ 16–17). Cabot's representative warranted the following to the Plaintiffs in negotiating the lease: that Cabot would test Plaintiffs' pond and water supplies prior to and after commencement of drilling operations to ensure that the water would not be adversely affected; that Cabot would timely and fully disclose the test results to Plaintiffs; that Plaintiffs' persons, property, and land resources would be undisturbed by said operations; that Plaintiffs' quality of life and use and enjoyment of the Property would not be disrupted or adversely affected; that if Cabot's operations do adversely affect the Property, Cabot would immediately disclose that information to Plaintiffs and take, at its sole expense, all steps necessary to return the Property to pre-drilling conditions; and that Cabot would remain at all times in compliance with all state and federal laws and regulations governing safe oil and gas drilling practices. (*Id.* ¶ 18).

The Defendants' drilling operations involve a process known as hydraulic fracturing, sometimes referred to as hydrofracturing or hydro-fracking, which discharge significant volumes of hydraulic fracturing fluids into underground shale

formations in order to discharge the gas contained therein. (*Id.* ¶¶ 19–20). The fracking fluids used by the Defendants in their operations included diesel fuel, lubricating agents, barite, gels, pesticides, and defoaming agents. (*Id.* ¶ 25). The Defendants failed to disclose the identity of all chemicals and components used to the Pennsylvania Department of Environmental Protection ("DEP") as required by law. (*Id.* ¶ 22). In addition to these hazardous chemicals, other contaminants, such as gas, oil, brine, heavy metals, and radioactive substances naturally present in the shale formations, are dislodged during drilling operations. (*Id.* ¶ 25). In order to collect the discharged waste fluids, drilling muds, and other hazardous substances, the Defendants maintain large waste pits at the Wells. (*Id.* ¶ 26).

The Defendants began drilling operations at the Wells near the Plaintiffs' Property in or about April of 2010. (*Id.* ¶ 27). Prior to that time, the Plaintiffs' groundwater supply had always appeared clean, containing no visible gases, malodors, or off-tastes. (*Id.* ¶ 28). The Plaintiffs had their groundwater supply tested before the commencement of drilling operations, and those tests revealed that the pre-drilling groundwater supply did not contain detectable levels of methane gas. (*Id.*). In August of 2010, the Plaintiffs began to notice that their groundwater supply had diminished in quality, containing excess sedimentation and appearing brown and cloudy. (*Id.* ¶ 30). The water supply likewise became malodorous, and in January of 2011, the Plaintiffs began to notice yellow and pink staining in their toilets from the polluted groundwater. (*Id.* ¶ 30–31). These issues continue to date. (*Id.* ¶ 32). Because of these issues, the Plaintiffs have ceased drinking from and no longer trust their water supply. (*Id.* ¶ 32).

The DEP has cited the Defendants on several occasions for noncompliance with state law as it governs oil and gas operations. In April of 2010, an inspection of Well # 2 revealed that the Well's waste pit liner was riddled with holes and that groundwater was infiltrating the waste pit and permitting hazardous wastewater to enter the soil and contaminate the groundwater. (*Id.* ¶¶ 35–36). The Defendants were cited for violating Pennsylvania law by failing to dispose of drill fluids in a manner that prevents pollution of the waters of the Commonwealth. (*Id.* ¶ 37). At about the same time, DEP representatives also observed negligent cement work and bubbling gas near the surface of Well # 2, deficiencies which it required Defendants to remedy. (*Id.* ¶ 38). Also in April of 2010, the Defendants caused approximately one-half barrel of waste fluids to be spilled directly on the surface at Well # 2. (*Id.* ¶ 40).

In December of 2010, the Defendants were again cited following an inspection for failing to properly case and cement Well # 3 so as to prevent migration of gas or waste fluids into groundwater supplies. (*Id.* ¶ 42). Gas was observed bubbling near the surface during this investigation as well. (*Id.*). The Defendants were also cited for failure to report defective casing and cementing within twenty-four (24) hours of discovery. (*Id.* ¶ 42). During an investigation in June of 2011, DEP representatives observed that diesel fuel was actively leaking onto a well pad and that a corner of the pad had a breach in the perimeter berm; the representative also noted that the presence of two other sorbent pads in the area suggested a recent unreported spill. (*Id.* ¶¶ 44–45). The Defendants were again cited for failure to construct their waste pits and tanks with sufficient capacity to contain pollutants. (*Id.* ¶ 46).

The DEP sampled the Plaintiffs' groundwater supply in January of 2011, approximately eight (8) months after the Defendants began their drilling activities. (*Id.* ¶ 47). The results of that sampling revealed that levels of dissolved methane in the Plaintiffs' groundwater supply were as high as 15.6 mg/L, rendering the water unsafe and unfit for human consumption. (*Id.* ¶ 47). The Plaintiffs believe and aver that the Defendants' noncompliance with the statutory and regulatory frameworks governing oil and gas drilling is responsible for allowing the methane and other harmful contaminants to enter the Plaintiffs' water supply. (*Id.* ¶ 49). The Plaintiffs assert that as a result, they have suffered loss of value to their Property, loss of the use and enjoyment of their Property and its land resources, and loss to their quality of life. Plaintiffs also assert that they have suffered damage to appliances which use the contaminated groundwater supply and have had incurred substantial out-of-pocket expenses for water quality monitoring, water sampling, and alternative potable water supplies. (*Id.* ¶ 51).

## IV. DISCUSSION

The Plaintiffs' Amended Complaint (doc. 42) sets forth nine separate causes of action, as follows: violation of the Pennsylvania Hazardous Sites Cleanup Act, 35 PA. STAT. §§ 6020.101 *et seq.* (Count I), negligence (Count II), negligence *per se* (Count III), private nuisance (Count IV), strict liability (Count V), trespass (Count VI), inconvenience and discomfort (Count VII), breach of contract (Count VIII), and fraudulent misrepresentation and inducement (Count IX). Counts I through VII are asserted against both Defendants Cabot and GasSearch; Counts VIII and IX are asserted against Defendant Cabot only. The Defendants contend in their Motion and supporting papers that the

Plaintiffs have failed to plead facts sufficient to support any or all of these claims. We address the claims *seriatim.*

## A. Count I: Violation of the Hazardous Sites Cleanup Act

The Defendants contend that the Plaintiffs' claim under Pennsylvania's Hazardous Sites Cleanup Act ("HSCA"), 35 PA. STAT. §§ 6020.101 *et seq.*, must be dismissed for several reasons. The Defendants argue that an HSCA claim requires that a plaintiff specifically identify the alleged hazardous substances, asserting that the HSCA demands more than a generic reference to "hazardous substances" in the complaint. Relatedly, the Defendants assert that the Plaintiffs have failed to identify the time and place of any of the alleged hazardous releases. The Plaintiffs respond that the Amended Complaint satisfies the HSCA's requirements and that such detailed averments are not required at this early stage.

■ To establish a *prima facie* case of liability under the Pennsylvania HSCA, a plaintiff must plead facts establishing that: "(1) defendants are responsible parties; (2) there has been an actual or threatened 'release' of a hazardous substance from a site; (3) 'response costs' were or will be incurred; and (4) the responses costs were 'reasonable and necessary or appropriate.'" *In re Joshua Hill, Inc.,* 294 F.3d 482, 485 (3d Cir.2002). The Defendants concede that, assuming the facts of the Amended Complaint to be true, the third and fourth elements of the Plaintiffs' HSCA claim are satisfied. (Doc. 62, p. 3). The Plaintiffs have also satisfied their pleading burden with respect to the first element, which requires that a plaintiff to establish that the defendant "owns or operates" the property when the hazardous substance is placed, located, or released,

*see* 35 Pa. Stat. § 6020.701(a)(1), by alleging that both Defendants owned the property and that their drilling operations caused the releases in question. (Doc. 42, ¶¶ 10–11).

We thus concern ourselves only with the second element and examine whether the Plaintiffs have adequately pled that "there has been an actual or threatened 'release' of a hazardous substance from a site." *Joshua Hill,* 294 F.3d at 485. The Defendants assert that the Plaintiffs' Amended Complaint fails to state an HSCA claim because the Plaintiffs have failed to specifically identify the allegedly hazardous substances released by the Defendants; the Plaintiffs counter that at this preliminary stage, they need not specifically identify each and every contaminant and, further, that they cannot do so because the Defendants have not identified—even to the DEP—each chemical used in their fracking process.

The HSCA defines a "hazardous substance" as

[a]ny element, compound or material which is:

(i) Designated as a hazardous waste under the act of July 7, 1980 (P.L. 380, No. 97), known as the Solid Waste Management Act, and the regulations promulgated thereto.

(ii) Defined or designated as a hazardous substance pursuant to the Federal Superfund Act.

(iii) Contaminated with a hazardous substance to the degree that is release or threatened release poses a substantial threat to the public health and safety or the environment as determined by the department.

(iv) Determined to be substantially harmful to public health and safety or the environment based on a standardized and uniformly applied department testing procedure and listed in regulations proposed by the department and promulgated by the Environmental Quality Board.

35 Pa. Stat. § 6020.103. Natural gas itself is expressly excluded from the definition of hazardous substances. *See id.*

 The Plaintiffs allege that the fracking fluids used by the Defendants and discharged into the ground and ultimately the groundwater included diesel fuel, lubricating agents, barite, gels, pesticides, defoaming agents, gas, oil, brine, heavy metals, and radioactive substances. (Doc. 42, ¶ 25). While, as noted, gas and oil are excluded from the HSCA's terms, it is beyond peradventure that the other substances identified by the Plaintiffs—*to wit,* barite, gels, pesticides, defoaming agents, heavy metals, and radioactive substances, and their composite materials—might well contain "hazardous substances to the degree that its release or threatened release poses a substantial threat to the public health and safety or the environment." 35 Pa. Stat. § 6020.103. The Plaintiffs aver that a combination of any or all of these substances has rendered their drinking water unsafe, and absent compelling argument to the contrary, we conclude that these allegations and all reasonable inferences drawn therefrom are sufficient to establish that the Defendants plausibly released a "hazardous substance" into the Plaintiffs' groundwater supply. The Amended Complaint sufficiently places the Defendants on notice of the claim against them, which is all that is required at this early stage. *See Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

 As a final matter, the Defendants contend that the Plaintiffs' Amended Complaint fails to identify precisely the time and place where the alleged release of hazardous materials occurred. The Defendants assert that this deficiency renders

the Plaintiffs' pleading insufficient to survive a Rule 12(b)(6) motion. As an initial matter, we note that it can be inferred from the Plaintiffs' allegations with respect to timing and location that releases at drilling wells identified as Wells # 2, # 3, # 4, and # 5 occurred between April 2010, when drilling commenced, and August 2010, when the Plaintiffs began to notice that their water supply had been contaminated. (Doc. 42, ¶¶ 27, 30). These allegations alone are, in our opinion, sufficiently clear to inform the Defendants of the relevant time period and location. Regardless of this point, district courts have concluded that a failure of specificity with respect to time and location does not defeat an otherwise well-pled HSCA claim. *See F.P. Woll & Co. v. Fifth & Mitchell St., Corp.,* 2006 WL 1805581, *7, 2006 U.S. Dist. LEXIS 44011, *22–23 (M.D.Pa. June 28, 2006) (finding that failure to identify precisely when and where hazardous substance was released is not fatal to HSCA claim provided remaining elements are satisfied). For these reasons, we find no merit in this final argument and will deny the Defendants' Motion to Dismiss as it pertains to Count I.

### B. Count II—Negligence

■ Pennsylvania common law requires a plaintiff to establish the following elements in support of a negligence claim: "(1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another." *Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1366 (3d Cir.1993) (citing

*Morena v. South Hills Health Sys.,* 501 Pa. 634, 462 A.2d 680, 684 n. 5 (1983)). The Defendants broadly assert that the Plaintiffs have stated no facts in support of this claim but instead only legal conclusions to which this Court is not required to give any assumption of truth. A review of the Plaintiffs' Amended Complaint reveals that the Defendants' argument on this point is simply without merit.

With respect to the first element, the Plaintiffs assert, and the Defendants apparently do not dispute, that the Defendants are under a legally cognizable duty to conform to certain standards of conduct. The laws and regulations of the Commonwealth of Pennsylvania establish that entities engaging in gas drilling operations must do so in a manner that would not jeopardize the health, safety, and well-being of the citizens of the Commonwealth. *See, e.g.,* 25 Pa.Code § 78.54 (requiring well operators such as the Defendants to "control and dispose of fluids ... in a manner that prevents pollution of the waters of this Commonwealth"); 25 Pa.Code § 78.86 (requiring well operator to promptly remedy any defective, insufficient, or improperly cemented casing so as to prevent pollution); *see also* 58 Pa. Cons. Stat. § 3217(b) (establishing casing requirements so as to "prevent migration of gas or fluids into sources of fresh groundwater"); 58 Pa. Cons.Stat. § 3218(a) (requiring well operator who pollutes public water supply to restore the affected supply with alternative potable water source).[2] It is indisputable then that the Defendants, as owners and operators of drilling wells, are subject to a certain and articulable standard of conduct, satisfying the first element.

**2.** The Plaintiffs also specifically assert that the DEP has cited the Defendants for violation of these very standards of conduct on numerous occasions. This point is most critical to our analysis of the Plaintiffs' negligence *per se* claim, addressed *infra.*

■ Further, the Plaintiffs satisfy the second element by pleading that the Defendants have used improper drilling techniques and materials and that they have constructed (and failed to remedy) deficient and ineffective well casings and waste disposal pits in violation of this standard of conduct. (*See, e.g.,* Doc. 42, ¶ 34 (Defendants engaged *inter alia* in improper drilling techniques and maintained defective casings), ¶ 36 (Defendants permitted holes to exist in waste pit liners), ¶ 36 (waste pit liner contained more than seven holes permitting wastewater to enter the groundwater supply), ¶ 39 (Defendants failed to timely repair the defective casings), ¶ 40 (Defendants spilled one-half barrel of drilling fluid at Well # 2)). We thus find that the Defendants have satisfied their pleading burden by establishing that the Defendants breached the applicable standard of conduct.

■ We turn then to the element of causation. Pennsylvania law presumes that "a well operator is responsible for pollution of a water supply if . . . (i) the water supply is within 1,000 feet of an oil or gas well; and (ii) the pollution occurred within six months after completion of drilling or alteration of the oil or gas well." 58 Pa. Cons.Stat. § 3218(c)(1). The Plaintiffs have pled that the identified wells are located within 1,000 feet from their Property and thus satisfy the first element of the statutory presumption. (Doc. 42, ¶ 13). The Plaintiffs have likewise satisfied the second element by demonstrating that their injuries began in August of 2010, approximately three (3) months after drilling operations commenced and while drilling operations were ongoing. (*Id.* at ¶¶ 27, 30). Notwithstanding this statutory presumption, the Plaintiffs' allegations and reasonable inferences drawn therefrom are sufficient to withstand a Rule 12 Motion: the Plaintiffs allege that Defendants began

their drilling activities in April of 2010, that they failed to take requisite and necessary precautions throughout their operations, that they were cited for failing to comply with these statutory requirements and for groundwater leaks as a result thereof, and that Plaintiffs shortly thereafter noticed that their groundwater source had been polluted. The temporal and physical proximity of the Defendants' actions to the Plaintiffs' harm, in addition to the lack of contemporaneous and alternative sources of the contamination, permit the reasonable inference that the Defendants were responsible for that harm. At this preliminary stage, we are unpersuaded by the Defendants' argument that causation has not been established.

■ Lastly, we consider whether the Plaintiffs have satisfactorily pled an injury caused by the Defendants' conduct. The Plaintiffs' Amended Complaint contains numerous allegations with respect to the harms that they have suffered, including: contaminated groundwater unsafe for human consumption (*id.* at ¶ 51(a)-(b)), loss of value to their property (*id.* at ¶ 51(c)), and damage to appliances which utilize the groundwater (*id.* at ¶ 51(i)). Most critically, the Plaintiffs have incurred and will continue to incur substantial costs for water sampling and testing, water quality monitoring, and water treatment systems, in addition to the costs of purchasing alternative water supplies. (*Id.* at ¶ 51(g)-(j)). Thus, the Defendants' contention that the Plaintiffs have failed to plead damages beyond "conclusory allegations" is entirely meritless. For all of these reasons, we will deny the Defendants' Motion to Dismiss the Plaintiffs' negligence claim.

### C. Count III—Negligence *Per Se*

In addition to their negligence claim, the Plaintiffs also raise a claim of negligence *per se*, premised upon the Defendants' al-

leged violations of several state laws, including the Pennsylvania Clean Streams Law ("CSL"), 35 Pa. Stat. §§ 691.1 *et seq.*, the Pennsylvania Solid Waste Management Act ("SWMA"), 35 Pa. Stat. §§ 6018.101, the Pennsylvania Oil and Gas Act, 58 Pa. Stat. § 601.101, *et seq.*, and the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. Stat. §§ 6020.101, *et seq.* The Defendants respond that the negligence *per se* claim should be dismissed for the same reasons as the negligence claim, reasons rejected *supra,* and because the Plaintiffs have failed to satisfy the additional element of negligence *per se* cases which requires that the "purpose of the statute [violated] must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally." *Wagner v. Anzon,* 453 Pa.Super. 619, 684 A.2d 570, 574 (1996).

▮ The District Court for the Western District of Pennsylvania has cogently explained the doctrine of negligence per se and its application in Pennsylvania as follows:

> Section 286 of the Restatement of Torts Second provides [that the] court may adopt as the Standard of Conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part (a) to protect a class of persons which includes the one whose interests are invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the type of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results.
>
> The Pennsylvania Supreme Court has accepted this as an accurate statement of the law. Not every statutory provision, however, will serve as the foundation for a claim of negligence per se.

Instead, a court must examine the legislation and determine whether the policy of the statutory scheme will be furthered by allowing it to serve as the basis for a claim of negligence *per se. Fallowfield Dev. Corp. v. Strunk,* 1990 WL 52745, *18–19, 1990 U.S. Dist. LEXIS 4820, *55–56 (W.D.Pa. Apr. 23, 1990) (quoting Restatement (Second) of Torts § 286). Thus, in order to state a claim based on negligence *per se,* a plaintiff must establish that: "(1) The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally; (2) The statute or regulation must clearly apply to the conduct of the defendant; (3) The defendant must violate the statute or regulation; [and] (4) The violation of the statute must be the proximate cause of the plaintiff's injuries." *Wagner,* 684 A.2d at 574.

▮ Our analysis with respect to the first element is well informed by the Western District's decision in *Fallowfield.* There, as in the case *sub judice,* the court considered whether the HSCA, SWMA, or CSL could serve as a basis for a claim of negligence *per se,* specifically querying whether these laws were intended to benefit the Plaintiffs and whether their policies will be furthered by permitting the negligence *per se* claim to proceed. Regarding the CSL, the court found that its express purpose is to "ensure clean streams throughout the Commonwealth" and that the plaintiffs were incidental but unintentional beneficiaries of the legislation. *Id.* at *20, 1990 U.S. Dist. LEXIS 4820 at *58–59. The court held that because the plaintiffs' negligence *per se* action would not further the CSL's policies, that claim should be dismissed. *Id.* However, regarding the HSCA and SWMA claims, the court went on to hold that because the respective legislative intents behind those laws are "to protect the citizens of this

Commonwealth from the dangers of the improper disposal of hazardous and solid waste ... these policies would be furthered by allowing violations of the SWMA and HSCA to serve as the basis for a claim of negligence *per se*." *Id.* The court thus allowed the claims of negligence *per se* premised on violations of the HSCA and SWMA to proceed. *Id.* We are in full agreement with the excellent analysis and reasoning set forth in *Fallowfield* and will adopt the rationale undergirding that opinion for our purposes in this action, concluding that the HSCA and SWMA may serve as the basis for a negligence *per se* claim, but that the CSL may not.[3]

█ The Plaintiffs here also assert a negligence *per se* claim based on the Defendants' alleged violations of the Pennsylvania Oil and Gas Act, 58 Pa. Cons.Stat. §§ 3201, *et seq.* The Oil and Gas Act includes the following among its express purposes: to "[p]rotect the safety and property rights of persons residing in areas where mining, exploration, development, storage or production occurs." 58 Pa. Cons.Stat. § 3202(3). The Plaintiffs presently before the Court reside less than 1,000 feet from the Defendants' gas wells and allege numerous injuries as a result of the Defendants' violations of the Oil and Gas Act, thus falling directly within the particular group of individuals that the Act is intended to protect. We thus conclude that the Plaintiffs have satisfied the first element of a negligence *per se* action with respect to the HSCA, the SWMA, and the Oil and Gas Act.

We must also consider whether the Plaintiffs have established that these laws "clearly apply to the conduct of the defendant," that the defendant violated these statutes, and that the violation of these laws was the proximate cause of the Plaintiffs' alleged harm. *Wagner,* 684 A.2d at 574. The Defendants contend, without elaboration, that the Plaintiffs have failed to allege facts which establish that the statutes apply to their conduct. We disagree. The Plaintiffs have alleged that the Defendants own and operate oil and gas wells and conduct oil and gas drilling and exploration activities in the Commonwealth. The Oil and Gas Act regulates nearly every aspect of the Defendants' activities. The HSCA and SWMA also regulate the Defendants' activities by prohibiting drillers from discharging hazardous substances and waste into the environment, although to a lesser degree than the Oil and Gas Act. Thus, the requirement that the statutory standard of conduct "clearly apply" to the Defendants' conduct is amply satisfied.

█ With respect to the third element, the Defendants contend that the Plaintiffs "baldly assert legal conclusions that Defendants have violated various Federal and State Acts, without identifying the specific

---

3. The Defendants cite to *Wagner* for the proposition that the "purpose of the statute [violated] must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally." *Wagner,* 684 A.2d at 574. The Defendants contend that because the statutes at issue here confer an ultimate benefit on the public at large, they cannot form the basis of a negligence *per se* claim. In *Wagner,* the Pennsylvania Superior Court concluded that the Philadelphia Air Management Code had the primary purpose of protecting the atmosphere of the city with only the incidental benefit, but not express legislative intent, of benefitting the city's citizens and on that basis dismissed the plaintiffs' negligence *per se* claim. We ultimately find that *Wagner* is readily distinguishable. There, the plaintiffs were merely incidental beneficiaries of a law's protections. Here, the Plaintiffs fall squarely within the subset of the population intended to be protected by the SWMA, HSCA, and Oil and Gas Act. Given this significant distinction, *Wagner* is thus not controlling here.

sections of the Acts Defendants are alleged to have violated." (Doc. 51, p. 22). This is patently untrue. The Plaintiffs' Amended Complaint asserts that the Defendants were cited during the relevant time period for violation of the Pennsylvania Oil and Gas Act. (Doc. 42, ¶¶ 89–92 (cited for violation of 25 PA.CODE § 78.54, 25 PA.CODE § 78.86, and 58 PA. CONS.STAT. § 3217(b))). Further, although the Plaintiffs do not allege that the Defendants were cited for their violation of HSCA or SWMA, they nonetheless assert facts which, if true, establish a violation of those Acts, including specific allegations that the Defendants failed to properly maintain their waste pits, that the Defendants permitted and failed to remedy hazardous substance and waste leaks, and that the Defendants' actions (and inactions) ultimately resulted in groundwater contamination in the areas surrounding their gas wells. The Plaintiffs have thus met their burden at this early stage by sufficiently pleading that the Defendants have violated these three statutes.

Lastly, we incorporate our analysis *supra* with respect to the final element of causation and conclude that the Plaintiffs have pled sufficient facts which, if true, could support a jury finding that the Defendants' violation of these statutes was the proximate cause of the Plaintiffs' injuries. We thus find that the Plaintiffs' Amended Complaint satisfies all elements of a negligence *per se* claim having the HSCA, SWMA, and Oil and Gas Act as a basis and will deny the Defendants' Motion to Dismiss Count III.[4]

### D. Count IV—Private Nuisance

In Count IV, the Plaintiffs assert a claim for private nuisance, alleging that the De-

fendants have created and maintained a continuing nuisance in the area of the Wells by allowing the Wells to exist and operate in a dangerous and hazardous condition and causing the discharge of hazardous chemicals and combustible gases into the Plaintiffs' groundwater supply. The Pennsylvania Supreme Court has adopted Section 822 of the Restatement (Second) of Torts for determining the existence of a private nuisance. This Section provides that:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

*Kembel v. Schlegel,* 329 Pa.Super. 159, 478 A.2d 11, 14–15 (1984) (quoting RESTATEMENT (SECOND) OF TORTS § 822). The Restatement further provides that "[t]here is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose." *Id.* at 15. Invasions are "significant" if "normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable." *Id.*

The Defendants again contend, citing *Iqbal,* that the Plaintiffs "rely on bald conclusory statements and simply recite the elements of a nuisance claim, which is in-

---

4. We note that this conclusion is also consistent with our holding in *Fiorentino v. Cabot Oil & Gas Corp.,* 750 F.Supp.2d 506 (M.D.Pa. 2010) (Jones, J.), where we held that substantially similar allegations satisfied the Plaintiffs' pleading burden on negligence *per se* claims and declined the Defendants' request to strike those claims.

sufficient to survive a motion to dismiss." (Doc. 51, p. 25). The Defendants further contend that the claim fails because it is based only on anticipated harm and that the Plaintiffs have failed to plea an actual and realized injury. As above, the Defendants' intentional mischaracterization of the Plaintiffs' Amended Complaint as a whole is fatal to their arguments.

We have concluded *supra* that the Amended Complaint contains sufficient facts which, assumed true, establish that the Defendants' negligence in operating their gas wells has caused and continues to cause actual injuries to the Plaintiffs' Property and, for the sake of brevity and avoiding superfluity, we shall not reiterate that rationale here. As we have held previously, the Plaintiffs have adequately asserted that the Defendants' negligence has caused and continues to cause harm to their property. We thus consider whether the alleged injuries to the Plaintiffs rise to the level contemplated by the Restatement.

 With respect to whether the alleged invasion is "definitely offensive, seriously annoying or intolerable," the Defendants contend that the Plaintiffs' injuries are speculative and merely "anticipated" as opposed to having been already realized. This contention is belied by the Plaintiffs' allegations that their water supply had already been contaminated as early as August of 2010 and that they have incurred costs for water sampling, water quality monitoring, and purchasing alternative potable water sources for consumption and other residential uses. These matters are a potentially serious inconvenience, and ongoing expenses to remedy them by the Plaintiffs could reasonably be deemed "seriously annoying or intolerable." We conclude that, at this juncture, the Plaintiffs have sufficiently alleged that the Defendants caused a substantial inva-

sion to the Plaintiffs' interest in the private use of their Property causing a "seriously annoying or intolerable" nuisance and satisfying the second prong of the Restatement test. We will thus deny the Defendants' Motion to Dismiss Count IV.

### E. Count V—Strict Liability

The parties are in agreement that no court has yet expressly decided whether natural gas drilling is or should be considered an abnormally dangerous activity subjecting parties such as the Defendants to strict liability. We recently deferred consideration of the issue at the motion to dismiss stage in *Fiorentino v. Cabot Oil & Gas Corporation,* 750 F.Supp.2d 506 (M.D.Pa.2010). There, as here, the Defendants urged the Court to extend the line of cases holding that the operation of gas station storage tanks and petroleum pipelines is not abnormally dangerous to the Defendants' natural gas drilling activities. *See id.* at 512 (citing *Smith v. Weaver,* 665 A.2d 1215, 1219–20 (Pa.Super.Ct.1995); *Melso v. Sun Pipe Line Co.,* 394 Pa.Super. 578, 576 A.2d 999 (1990)). In *Fiorentino,* we declined to extend the rationale of those cases to gas drilling activities on the limited factual record before the Court and deferred ruling on the issue to the summary judgment stage, where a more fully developed factual record would better inform our decision. *Id.* The parties acknowledge that *Fiorentino* involved nearly identical factual allegations. Because no court has resolved the issue in the interim period following that decision, we are inclined to follow the same course in this litigation as we did in *Fiorentino* for the reasons that follow.

The Defendants' arguments against the *Fiorentino* course are unavailing. The Defendants argue that although the *Fiorentino* matter never reached a stage where the strict liability issue was ultimately de-

termined, their "counsel's vast knowledge of [*Fiorentino's* ] three year litigation history ... and the ensuring [sic] discovery and expert reports" compels this Court to reconsider that decision and conclude that gas drilling is not an abnormally dangerous activity. (Doc. 51, p. 27). In essence, the Defendants assert that the Court should take Defendants' counsel at their word that the record that developed in *Fiorentino* would not have supported the *Fiorentino* plaintiffs' position and thus does not support the Plaintiffs' position here. The Defendants thus urge us to disaffirm the course we charted in *Fiorentino* and dismiss the Plaintiffs' strict liability claim.

▮ The Defendants' argument is flawed and based on their own *ipse dixit* premise. As a threshold matter, their contentions are premature. The Defendants cannot guarantee, and we decline to presume, that the factual record in the matter *sub judice* will develop identically to the record in *Fiorentino*. Moreover, as the Defendants concede, the *Fiorentino* matter never resulted in a decision on the merits with respect to this issue and thus offers little guidance despite the attempt to persuade us otherwise. We are unconvinced, absent intervening changes in the law or compelling argument from the parties, that it is logical to chart a different course than that chosen in *Fiorentino*. We thus decline to commit a judicial overreach by prematurely considering such a critical issue at this juncture, finding that such a landmark determination is most appropriately deferred for resolution until the Court has before it a fully developed factual record. Accordingly, we conclude, as we did in *Fiorentino*, that it is improvident to reach the merits of this issue or to extend the cases cited by the Defendants

to the activities in question here at this stage of the litigation and will deny the Defendants' Motion to Dismiss Count V.[5]

## F. Count VI—Trespass

▮ The parties are in agreement that under Pennsylvania law, a trespass is defined as "an unprivileged, intentional intrusion upon land in possession of another." *United States v. Union Corp.*, 277 F.Supp.2d 478, 495 (E.D.Pa.2003); *Graham Oil Co. v. B.P. Oil Co.*, 885 F.Supp. 716, 725 (W.D.Pa.1994). In order to maintain an action in trespass, "a plaintiff must have had exclusive use and possession of the property at issue." *Id.* In *Graham*, a corporate lessor brought suit against a corporate lessee to which the plaintiff had granted exclusive possession of its property for the purpose of operating a gas station. *Id.* at 718–19. When the underground gasoline storage tanks were removed, the plaintiff alleged that gasoline contaminated the subsurface of its property. *Id.* The court in *Graham* ultimately concluded that because the defendants were in possession of the land with the permission of the owner, an action in trespass does not lie. *Id.* at 725 (noting that because it was "undisputed that the contamination of the property occurred during the lease term," lessor cannot recover in trespass against lessee). The Defendants contend that this case is analogous to *Graham* and that the Plaintiffs' claim necessarily fails because the Defendants were at all times in lawful possession of the property. On this claim, we agree with the Defendants.

The Plaintiffs offer little argument to counter the striking analogy between this action and *Graham*. In opposition to the Defendants' argument, the Plaintiffs cite

**5.** As we noted in *Fiorentino* and reiterate here, nothing in this opinion will operate to bar the Defendants from revisiting these issues at the summary judgment stage.

to *King v. U.S. Steel Corporation,* 432 Pa. 140, 247 A.2d 563 (1968), stating that the Pennsylvania Supreme Court there maintained an action in trespass for "natural resource contamination although plaintiff had leased property to [the defendant] steel company." (Doc. 55, p. 31 (citing *King* )). A review of *King* reveals that it is inapposite. First, the Plaintiffs misstate the predicate of that case, representing to this Court that *King* involved a trespass action brought by a plaintiff lessor against a defendant lessee who had allegedly contaminated the lessor's crops. In fact, in *King,* the plaintiff farmer had leased adjacent properties from both a third party and the defendant steel manufacturer. Because the lease with the steel manufacturer provided that it would not be liable to the plaintiff for crop damage on the leased property caused by its plant, the plaintiff brought suit against the manufacturer alleging damage to the land leased from the *third party* and not from the defendant. Accordingly, the facts render these cases entirely distinguishable.

The Plaintiffs also assert that *Graham* is inapposite here because the defendant in *Graham* had been granted "exclusive" use of the contaminated property whereas here, the Plaintiffs continued to live on the leased land and thus the Defendants were granted only limited access thereto. This distinction, in our view, is one without a difference. The crux of *Graham* is that where a lessee is "authorized to be on the premises" or "authorized to be in possession of the premises," a trespass action simply cannot lie against the lessee who then lawfully enters the property. *See Graham,* 885 F.Supp. at 725. This interpretation is amply supported by general principles of trespass law as developed in the Pennsylvania courts. *See Gedekoh v. Peoples Natural Gas Co.,* 183 Pa.Super. 511, 133 A.2d 283, 284 (1957) ("A right of entry constitutes an absolute defense to an action in trespass."). The law offers copious other means for the Plaintiffs to seek redress for their alleged harms, including the causes of action hereinabove permitted to proceed, and we decline to add to that arsenal by needlessly extending the Commonwealth's long-established law of trespass. We will thus grant the Defendants' Motion to Dismiss to the extent it seeks dismissal of Count VI.

## G. Count VII—Inconvenience and Discomfort

In the seventh count of their Amended Complaint, the Plaintiffs assert a separate claim and cause of action for "inconvenience and discomfort." The Defendants assert that this claim must be dismissed because the Pennsylvania Supreme Court has held that inconvenience and discomfort are not separately recognized causes of action but instead are items of damages. *Centolanza v. Lehigh Valley Dairies,* 540 Pa. 398, 658 A.2d 336, 337–38 (1995) (holding, in a case brought under the Pennsylvania Storage Tank and Spill Prevention Act, that the plaintiffs claims for inconvenience, loss of use and enjoyment, and diminution of value of their property "are claims for damages and not causes of action"). In response, the Plaintiffs cite to *Berish v. Southwestern Energy Production Company,* 763 F.Supp.2d 702 (M.D.Pa.2011), where this Court stated that "Pennsylvania law recognizes 'a cause of action for inconvenience and discomfort caused by interference with another's peaceful possession of his or her real estate.' " *Id.* at 706 (quoting *Houston v. Texaco, Inc.,* 371 Pa.Super. 399, 538 A.2d 502, 505 (1988)). We ultimately find that the Plaintiffs' interpretation of *Berish,* while on its face plausible, is nothing more than a misreading of superfluous or unfortunate dicta and that neither the *Houston* nor the *Berish* court intended to create a

separate claim and cause of action for inconvenience and discomfort.

■ As a threshold matter, we note that the Pennsylvania Supreme Court has never held overruled, superseded, or otherwise called into question its express holding in *Centolanza* that inconvenience and discomfort are items of damages and not causes of action. Following *Centolanza*, in *Houston*, the Pennsylvania Superior Court noted that "where injury is sustained to real property as a result of the negligence of another, the property owner is entitled to *damages* for the inconvenience and discomfort caused thereby." *Houston*, 538 A.2d at 505 (emphasis added). The Court went on to state that the law does recognize "a cause of action for inconvenience and discomfort" but concluded that because the claim was not pleaded, the jury could not make an award of these damages. *Id.* at 506. Similarly, in *Berish*, the plaintiff moved this Court for leave to amend her complaint to seek damages for "inconvenience and discomfort" in conjunction with her emotional distress claims. *Berish*, 763 F.Supp.2d at 706. The Court observed that Pennsylvania law "recognizes 'a cause of action for inconvenience and discomfort'" and granted leave to amend "in order to add claims for *damages* for inconvenience and discomfort." *Id.* (emphasis added).

It is our perception that neither court intended its opinion to create a separate and actionable tort but instead only sought to include inconvenience and discomfort as separate items of damages. Indeed, while both courts refer in passing to claims for such damages as a "cause of action," neither court took the extra and requisite step of establishing a standard of review for such a claim. The failure of both courts to do so overwhelmingly supports our view that neither court intended to develop a new and separate tort claim.

It is the opinion of this Court that rather than creating a separate and actionable tort claim, both courts intended only to allow the plaintiffs to include claims for inconvenience and discomfort *damages* in connection with their existing tort claims for negligence and emotional distress, respectively. It is our view that the Pennsylvania courts, and this Court in interpreting those decisions, never intended to create a separate and actionable tort of "inconvenience and discomfort." We thus agree with the Defendants that Count VII must be dismissed because the Plaintiffs have, in a very literal sense, failed to state a "claim" for which relief can be granted.

## H. Count VIII—Breach of Contract

■ In Count VIII, the Plaintiffs assert a claim for breach of contract against only Defendant Cabot. It has been held by Pennsylvania courts that gas leases are governed by general principles of contract law and interpretation. *See Lyco Better Homes, Inc. v. Range Res.-Appalachia, LLC*, 2009 U.S. Dist. LEXIS 110425, *7 (M.D.Pa. May 21, 2009). Under Pennsylvania law, a plaintiff asserting a breach of contract claim must first establish the essential terms of the contract and then demonstrate that the defendant breached a duty imposed by one or more of those terms and that the plaintiff suffered damages as a result. *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa.Super.Ct.2004); *CoreStates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super.Ct.1999).

We must first consider, then, what essential terms make up the contract relative to the Plaintiffs' claims. In their Amended Complaint, the Plaintiffs assert that Cabot had the following obligations under the Gas Lease: to test Plaintiffs' domestic water supply prior to commencement of drilling operations and ensure that the water supply was not adversely affected; to re-

turn the water supply to pre-drilling quality in the event the operations were determined to have contaminated the water; to construct and install wells in a manner which would minimally affect the water supply; and to conduct operations in accordance with DEP regulations. (Doc. 42, ¶¶ 18, 149–156). Cabot apparently agrees that the Gas Lease created these obligations but contends that inclusion of the phrase "on the premises" therein excludes harms resulting from *subsurface* drilling from these provisions. (Doc. 61, p. 37–38). Resolution of this issue thus turns on proper interpretation of the phrase "on the premises" as used within the Gas Lease.

When a written agreement is unambiguous, "its meaning must be determined by its contents alone." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir.1980). In *Benchmark Group, Inc. v. Penn Tank Lines, Inc.*, 612 F.Supp.2d 562 (E.D.Pa.2009), the court articulated the standard for contractual interpretation as follows:

> The task of interpreting a contract is generally performed by a court, rather than by a jury ... The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. Thus, a contract that is unambiguous on its face must be interpreted according to the natural meaning of its terms, unless the contract contains a latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct interpretation.

*Id.* at 574. Contrary to Cabot's position that the phrase "on the premises" pellucidly means the surface only, our review of the Gas Lease reveals that the language of the lease itself gives rise to a latent ambiguity. This unclarity can be resolved by an analysis of the lease as a whole and, in particular, the purpose of the lease.[6]

As above noted, Cabot contends that the phrase "on the premises" as referenced in the lease is clear and unequivocal and relates only to the surface area of the land, thus limiting its remedial obligations to remedying those harms caused by *surface* activities alone. Cabot notes that other sections of the agreement refer to the term "premises" in a manner which distinguishes it from subsurface areas, for example, in paragraph 5, which grants the lessee the right to force to pool "any part or parts of the premises, or formation, depth or depths thereunder," and paragraph 6, which grants Cabot the right to "use any formation(s) underlying the premises." (Doc. 62, pp. 20–21). Cabot contends that if "premises" included subsurface areas, these references to "formations underlying the premises" and the "depths thereunder" would be superfluous and that the term "premises" must necessarily mean only the surface area. (*Id.*).

The Plaintiffs counter with citation to Blackstone's Commentaries from 1803, wherein it is noted that land has "in it's legal signification, an indefinite extend, upwards as well as downwards." 2 BLACKSTONE, COMMENTARIES 18 (1803). While the Plaintiffs' Blackstone argument is largely unexplored and lacks any other legal citation, it appears to be the Plaintiffs' position that because they own their land from the

---

6. We deem this a latent ambiguity because, on its face, the term "premises" has an attached legal definition and it is, independent of context, unambiguous. *See* BLACK'S LAW DICTIONARY 1300 (9th ed. 2009) (defining term as a "house or building, along with its grounds"). This definition is unfortunately unhelpful to our inquiry, as the term "grounds" is undefined.

core of the Earth and up to the heavens— at least as described by Blackstone—the term "premises" as defined in the agreement must necessarily relate to both the surface and subsurface lands. (Doc. 55, pp. 33–34).

Neither of the parties present us with particularly helpful arguments in support of their respective interpretations. Accordingly, we ultimately find that considering the agreement as a whole, rather than parsing the use of "premises" therein, clarifies the parties' intent in the use of the word throughout the Gas Lease.

■■■ The purpose of the Gas Lease as identified therein was for the lessor Plaintiffs to lease to lessee Cabot land identified as "the premises" for the purpose exploring for and ultimately withdrawing natural and other gas stored in the rock underlying the leased property. (Doc. 51–2, ¶ 1). Paragraph 1 of the Gas Lease states that the Plaintiffs' Property, identified by township and county and as bounded by listed adjacent properties, shall be referred to as "premises" through the remainder of the lease. (*Id.*). That same paragraph indicates that this identified land, expressly deemed "premises," is leased to Cabot for the purpose of conducting oil and gas exploratory and drilling operations below the surface of the Property and that Cabot shall have the right to extract natural and other gases therefrom. (*Id.*). It hardly seems logical that "premises" in paragraph 1, which defines the very property leased and the rights granted to Cabot, would include the subsurface area while, in subsequent paragraphs articulating Cabot's remedial responsibilities, liability for operations "on the premises" would be limited

to only surface operations. Despite its apparent desires, Cabot cannot selectively interpret the term "premises" to include subsurface areas in one provision but exclude subsurface areas in another for its own financial benefit.[7]

■■■ The remainder of our breach of contract inquiry is much simpler. The Plaintiffs, having established contingent obligations on the part of Cabot, must demonstrate that the contingent obligation became an affirmative one, that Cabot failed to satisfy the contractual obligation, and that the Plaintiffs suffered damages as a result. *See Omicron Sys., Inc.*, 860 A.2d at 564; *CoreStates Bank*, 723 A.2d at 1058. Here, the Plaintiffs have alleged facts which establish that Cabot was responsible for contaminating its groundwater, thus triggering the remedial provisions and establishing an affirmative obligation for Cabot. The Plaintiffs have further alleged that Cabot has failed to satisfy those obligations by failing to return their groundwater to pre-drilling quality as required by the agreement and that they have incurred and will continue to incur substantial financial costs until and unless Cabot satisfies its contractual obligations. Thus, assuming the facts as pled to be true, the Plaintiffs have successfully pled that Cabot has breached the Gas Lease and that they have·suffered damages as a result.

## I. Count IX—Fraudulent Misrepresentation

■■■ In the ninth and final count of the Amended Complaint, the Plaintiffs assert a claim. for fraudulent misrepresentation against Cabot. Under Pennsylvania law, to prevail on such a claim, the Plaintiffs

---

7. Further, it is our supposition that had Cabot intended to immunize itself from any liability resulting from subsurface drilling, it would have expressly and unequivocally done so in the contract. While the benefit of hindsight might encourage Cabot to limit its contractual obligations, it is not this Court's prerogative to rewrite such exclusions into an otherwise well-drafted agreement.

must establish the following six elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pen.*, 7 A.3d 278, 290 (Pa.Super.Ct.2010); *Dufour v. Carrizo Oil & Gas, Inc.*, 2011 WL 1136801, *5, 2011 U.S. Dist. LEXIS 31381, *14 (W.D.Pa. Mar. 25, 2011). Cabot contends that the Plaintiffs fail to establish essential elements of the claim and, further, that they have failed to satisfy the heightened pleading requirements for claims of fraud established by Federal Rule of Civil Procedure 9(b). We agree with Cabot that Plaintiffs have failed to satisfactorily plead at least one element of their misrepresentation claim.[8]

■ Specifically, the Plaintiffs have failed to satisfy what has been considered a "key element" of fraudulent misrepresentation claims—the element of scienter. *Steffy & Son,* 7 A.3d at 290. It has long been established that a defendant's knowledge of the untrue nature of his representation is a crucial and necessary element in stating a claim for fraudulent representation. *Id.* It is not enough that a representation is ultimately proven to be false; the representation must have been knowingly false when made and the plaintiff must plead facts establishing that the speaker knew the statement to be false at that time. *See, e.g. Mackay v. Donovan,* 747 F.Supp.2d 496, 504 (E.D.Pa.2010) (dismissing claim where plaintiffs failed to plead facts suggesting that the defendant had

"deliberately misrepresented the truth or concealed a material fact" or otherwise "acted with the requisite fraudulent scienter" at the time the parties entered the agreement"); *Shoemaker v. Commw. Bank,* 700 A.2d 1003, 1006 (Pa.Super.Ct.1997) ("It is well-established that the breach of a promise to do something in the future is not actionable in fraud.").

■ Here, the Plaintiffs plead no facts to establish that Cabot's agent knew that her representations were or might be rendered false at the time they were made. Instead, Plaintiffs supply only conclusory allegations, contending that because the statements ultimately "proved to be false" (doc. 42, ¶ 164), they "had to have been knowingly false when made." (Doc. 55, p. 38). Such bare assertions, unsubstantiated by factual allegations, are insufficient to establish a claim for fraudulent misrepresentation. Because the Plaintiffs' conclusory allegations fail to sufficiently allege scienter, we will grant Cabot's motion to dismiss Count IX.

## V. CONCLUSION

For all of the reasons articulated hereinabove, the Court will grant in part and deny in part the Defendants' Motion to Dismiss. (Doc. 50).

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Defendants' Motion to Dismiss (doc. 50) is **GRANTED** in part and **DENIED** in part as follows:

 a. The Motion is **GRANTED** to the extent it seeks dismissal of Counts VI (trespass), VII (inconvenience and discomfort), and IX (fraudulent misrepresentation) and said counts

---

8. Because we find that the Plaintiffs have failed to state a critical element of their claim, we do not address Cabot's arguments with respect to the parol evidence and gist of the action doctrines or with respect to Rule 9(b)'s heightened pleading requirements.

are **DISMISSED** from the Amended Complaint.

b. The Motion is **DENIED** in all other respects.

2. The parties shall confer and stipulate to a trial term consistent with the Court's calendar as attached hereto and file said stipulation on the docket within twenty (20) days of the date of this Order.